UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____ - CV - _____

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | |
|     Plaintiff, | |
|     v. | |
| **A+ FINANCIAL CENTER, LLC**, a Florida limited liability company, also doing business as **ACCELERATED FINANCIAL CENTERS, LLC**, | **FILED UNDER SEAL** |
| **ACCELERATED ACCOUNTING SERVICES LLC**, a Florida limited liability company, | |
| **CHRISTOPHER L. MIANO**, individually and as the managing member of Accelerated Accounting Services LLC, and | |
| **DANA M. MIANO**, individually and as the managing member of A+ Financial Center, LLC, | |
|     Defendants. | |

## COMPLAINT FOR PERMANENT INJUNCTION
## AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15

1

U.S.C. § 45(a), and in violation of the FTC's "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310.

## SUMMARY OF THE CASE

2.     Since at least November 2009, Defendants have been engaged in a telemarketing scheme in which Defendants, either directly or through one or more intermediaries, have been responsible for placing hundreds of thousands of illegal telemarketing calls – most of which start with illegal prerecorded "robocalls" – to consumers all across the country to sell phony credit-card interest rate reduction services.

3.     During these calls, consumers typically hear a prerecorded  message from a female voice who often says her name is "Rachel."  "Rachel's" message offers consumers the opportunity to substantially lower their credit card interest rates and instructs them to press a number on their phone to be connected to a live representative for further details.  When the consumer presses the number on their telephone keypad, the consumer is connected to a live representative who works for Defendants.  The representative, however, tells the consumer he or she works for "Card Services," which tricks many consumers into thinking that Defendants have some affiliation with the consumer's bank or credit card company.

4.     After gaining the consumer's trust with this deception, Defendants' live representative obtains credit card information from the consumer that the representative then uses to determine whether the consumer has enough available credit to cover a fee ranging from $495 to $1,595 and, if so, to charge the consumer's credit card that fee.  In exchange for this up-front fee, Defendants' live representative guarantees the consumer that:  (a) Defendants will be able to substantially reduce the interest rates on the consumer's credit cards, often promising rates as low as 6% or even 0%; (b) using Defendants' services will save the consumer thousands of dollars of interest; (c) the amount of interest the consumer will save with lowered interest rates

2

will exceed the amount of Defendants' fee; and (d) the consumer will be able to get out of debt three to five times faster with Defendants' help. Defendants' claims are inherently deceptive because most banks will not agree to lower a consumer's interest rates at all or, at most, will only agree to a very modest reduction in interest rate that falls far short of the significantly low interest rates Defendants guarantee in their calls.

5.      After collecting their up-front fee from the consumer, Defendants sometime undertake a few rudimentary efforts to make it seem like they are attempting to reduce the consumer's credit card interest rates, such as setting up calls with the consumer's banks to ask for a lower interest rate or advising the consumer to open a new credit card with an introductory interest rate and then transfer existing balances to the new card. These tactics, however, rarely succeed in obtaining any reduction in interest rates for the consumer, let alone the significant and long-term reductions and savings that Defendants promise in their initial call. In short, most consumers who pay Defendants' hefty up-front fee end up with little to show for it, as they save little to no money, are unable to get out of debt any faster, and do not receive the lowered credit card interest rates Defendants promised them.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

7.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 15 U.S.C. § 53(b).

## PLAINTIFF

8.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act,

3

the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

9.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b, 6102(c), and 6105(b).

## DEFENDANTS

10.      Defendant A+ Financial Center, LLC ("A+"), also doing business as Accelerated Financial Centers, LLC, is a Florida limited liability company with its principal place of business at 10258 S. US Highway 1, Port Saint Lucie, Florida 34952.  A+ transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, A+ has advertised, marketed, distributed, or sold credit card interest rate reduction services to consumers throughout the United States.

11.      Defendant Accelerated Accounting Services LLC ("Accelerated Accounting") is a Florida limited liability company with its principal place of business at 10256 S. US Highway 1, Port Saint Lucie, Florida 34952.  Accelerated Accounting transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Accelerated Accounting has advertised, marketed, distributed, or sold credit card interest rate reduction services to consumers throughout the United States.

12.      Defendant Christopher L. Miano ("Chris Miano") is the Managing Member of Accelerated Accounting and a manager of A+.  At all times material to this Complaint, acting alone or in concert with others, Chris Miano has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of A+ and Accelerated Accounting,

including the acts and practices set forth in this Complaint.  Defendant Chris Miano resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13.     Defendant Dana M. Miano ("Dana Miano") is the Managing Member of A+ and a manager of Accelerated Accounting.  At all times material to this Complaint, acting alone or in concert with others, Dana Miano has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of A+ and Accelerated Accounting, including the acts and practices set forth in this Complaint.  Defendant Dana Miano resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14.     Defendants A+ and Accelerated Accounting (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that have commingled funds and engaged in a common scheme.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Chris Miano and Dana Miano have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

15.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

16.     Since at least November 2009, Defendants have engaged in a telemarketing scheme in which they falsely guarantee consumers that they can reduce the consumer's credit card interest rates and save the consumer thousands of dollars if the consumer pays Defendants an up-front fee.

17.     In truth and in fact, Defendants' guarantees are deceptive because most banks will not agree to lower a consumer's interest rates at all or, at most, will only agree to a very modest reduction in interest rate that falls far short of the significantly low interest rates Defendants guarantee to consumers.  As such, most consumers who pay Defendants' up-front fee cannot receive the lowered credit card interest rates or savings that Defendants promise during telemarketing calls.

## Defendants' Deceptive Telemarketing Campaign

18.     Since at least November 2009, Defendants have engaged in a plan, program, or campaign to advertise, market, promote, offer for sale, or sell credit card interest rate reduction services through interstate telephone calls to consumers throughout the United States.

19.     Defendants, acting directly or through one or more intermediaries, contact consumers through unsolicited telemarketing calls.

20.     In numerous instances, the consumers who receive Defendants' unsolicited telemarketing calls have registered their telephone numbers on the National Do Not Call Registry ("Registry") prior to receiving the call.

21.     In numerous instances, Defendants, acting directly or through one or more intermediaries, "spoof" their calls by transmitting phony Caller ID information that indicates that the call is from "Card Services" or some other similar generic business name designed to make the consumer believe that the call is from the consumer's bank or credit card company.

22.     In numerous instances, Defendants' telemarketing calls deliver prerecorded voice messages, commonly known as "robocalls."

23.     The prerecorded messages are typically of a female voice who often says her name is "Rachel."

24.     The prerecorded messages offer consumers the purported opportunity to secure substantially lower credit card interest rates and instruct consumers to press a number on their phone to be connected to a live representative.  When the consumer presses the number on their telephone keypad, the consumer is connected to a live representative who works for Defendants.

25.     During telemarketing calls, Defendants do not identify themselves as A+ or Accelerated Accounting at the start of the call.  Rather, Defendants identify themselves as representatives of "Card Services" or some other similar generic business name that sounds like a bank or credit card company.

26.     During telemarketing calls, Defendants guarantee that they can substantially reduce consumers' credit card interest rates.

27.     During telemarketing calls, Defendants often tell consumers that they can obtain interest rates as low as 0% to 6%.

28.     During telemarketing calls, Defendants often tell consumers that the credit card interest rate reductions Defendants will obtain will be permanent or will last for several years.

29.     During telemarketing calls, Defendants guarantee that their interest rate reduction services will provide substantial savings to consumers, typically in the range of $1,200 to $4,000 or more within one year.

30.     During telemarketing calls, Defendants often claim their services will allow consumers to get out of debt three to five times faster.

31.     During telemarketing calls, Defendants often tell consumers that using their services will not hurt the consumer's credit and, in fact, that using Defendants' services will improve their credit because the consumer will be able to pay off his or her credit card debt faster.

32.     During telemarketing calls, Defendants often tell consumers that using their services will not require the consumer to close his or her existing credit cards.

33.     During telemarketing calls, Defendants often tell consumers that they can obtain substantial interest rate reductions on all types of credit cards (Visa, MasterCard, American Express, Discover), regardless of which bank issued the credit card to the consumer.

34.     During telemarketing calls, Defendants often tell the consumer initially that the consumer will not incur any out-of-pocket expense in using their services and that, as long as the consumer qualifies, the consumer will not have to send Defendants a check or money order.

35.     Later in the call, however, Defendants tell the consumer that he or she will have to pay Defendants an up-front fee that typically ranges from $495 to $1,595 in order to obtain the lowered credit card interest rates.

36.      During telemarketing calls, Defendants often claim that the amount of Defendants' fee will be quickly offset by savings the consumer will receive through the significantly reduced interest rates Defendants will obtain for the consumer.

37.     During telemarketing calls, Defendants often tell consumers that to "qualify" for Defendants' credit card interest rate reduction program, the consumer must have one credit card that is in "good standing."  Defendants explain to consumers that in order for a credit card to be in "good standing," the consumer must be current on his or her payments on that card and not be over the card's credit limit.

38.     During telemarketing calls, Defendants tell consumers that they must provide Defendants with their credit card number, expiration date, telephone number, last four digits of their social security number, and/or zip code so that Defendants can determine whether the consumer "qualifies" or "is eligible for" Defendants' credit card interest rate reduction program.

39.     Defendants use the credit card information provided by the consumer to contact the consumer's bank to determine whether the consumer's card is in good standing and whether the consumer has a sufficient amount of available credit on his or her card to pay Defendants' fee.

40.     If the consumer's card is in good standing and has sufficient available credit to cover Defendants' fee (i.e., at least $500 in available credit), Defendants charge their fee to the consumer's credit card.

41.     Defendants charge their fee to the consumer's credit card during or immediately after the telemarketing call, long before Defendants have undertaken any efforts to reduce the consumer's credit card interest rates.

42.     If the consumer's credit card is not in good standing or does not have enough available credit to cover Defendants' fee, Defendants claim the consumer has not "qualified" and ask the consumer to provide another credit card for qualification purposes.  This process repeats until either the consumer provides a credit card that can be charged or the consumer has exhausted all of his or her available credit cards.

43.     If the consumer is unable to provide a credit card to which Defendants can charge their fee, Defendants often tell the consumer that he or she has failed to qualify and the call ends.

44.     During telemarketing calls, Defendants guarantee that if consumers do not save the promised amount of money within one year as a result of lowered credit card interest rates

obtained by Defendants, consumers will receive a full refund of the cost of Defendants' services.

### Defendants' Written Claims

45.     A few days after the consumer's credit card is charged, Defendants typically send the consumer a package of materials relating to their services.

46.     In the written package, Defendants make many of the same claims and guarantees about their services that Defendants made to the consumer during the initial telemarketing call.

47.     Defendants state in their written materials that they "are a fully Licensed and Bonded agency specializing in skillful debt reduction."

48.     Defendants state in the written materials that "[t]hrough skillful negotiation with [the consumer's credit card] lenders, [Defendants] will significantly reduce the high interest rates on [the consumer's] current unsecured debt; thereby allowing [the consumer's] monthly payments to be applied to more of the principal, and substantially reducing the time it takes to pay off [the consumer's] loans!"

49.     In the written materials, Defendants promise the same guaranteed savings that Defendants told the consumer during the telemarketing call – i.e., Defendants guarantee in writing that the consumer will save at least $1,200 to $4,000 in one year with the lowered interest rates that Defendants will obtain for the consumer or else the consumer will receive a full refund.

50.     The package of materials Defendants send to the consumer also includes several forms that ask the consumer to list all of his or her credit card numbers, interest rates, issuing bank names, credit limits, balances, and monthly payment amounts and to provide various types of personal financial information such as the consumer's annual household income and whether the consumer has ever filed for bankruptcy.  Defendants instruct the consumer to complete the forms with his or her personal financial information and return the signed forms to Defendants.

## Defendants' Failure to Obtain Lowered Interest Rates

51.     In some instances, after the consumer completes, signs, and returns the forms, Defendants initiate three-way telephone calls with the consumer and the customer service departments of the banks that issued the credit cards that the consumers listed on the forms. During these three-way telephone calls, Defendants verbally request, or prompt the consumer to verbally request, that the bank reduce the consumer's interest rate on his or her credit card.

52.     The three-way calls initiated by Defendants are rarely successful in lowering the consumer's credit card interest rates to the levels Defendants promised during the initial telephone call.  In numerous cases, the banks that issued the consumer's credit card decline to lower the interest rate at all or, at most, agree to a very modest reduction in the interest rate for a short period of time that falls far short of the rates Defendants guaranteed the consumer in the initial call.

53.     The three-way telephone calls with the consumer's credit card issuing banks are often the total extent of Defendants' credit card interest rate reduction services.

54.     After the three-way telephone calls to the consumer's credit card companies have failed, Defendants sometimes also advise the consumer to obtain new credit cards with low introductory rates ("teaser rates") and transfer their existing credit card balances to those new cards.

55.     In numerous instances, the tactic of opening new "teaser rate" cards fails as well, because consumers are usually unable to qualify for such cards due to poor credit and/or the amount of their existing debt.

56.     Once Defendants' tactics of three-way calls to the consumer's credit card companies and opening new credit cards with low introductory rates have failed to deliver on the guaranteed interest-rate reductions, Defendants usually stop returning the consumer's phone calls

11

and otherwise cease communicating with the consumer.

## Defendants' Claims Are False and Deceptive

57.     In truth and in fact, Defendants' claim that they can obtain substantial interest rate reductions on all types of credit cards (Visa, MasterCard, American Express, Discover), regardless of which bank issued the credit card to the consumer is false and deceptive because there are several banks which will not work with Defendants to lower credit card interest rates for consumers.

58.     In truth and in fact, Defendants' claims that they can save the consumer thousands of dollars by substantially reducing the consumer's credit card interest rates are false and deceptive because most banks will not agree to lower a consumer's interest rates at all or, at most, will only agree to a very modest reduction in interest rate that falls far short of the significantly low interest rates Defendants guarantee to consumers.  As such, most consumers who pay Defendants' up-front fee cannot receive the lowered credit card interest rates or the savings that Defendants promise during telemarketing calls and are unable to pay their credit card debts any faster.

59.     Without a detailed understanding of the consumer's individual economic, financial, credit, and personal circumstances – information Defendants typically do not obtain from the consumer during their telemarketing calls – it is unlikely that Defendants can make any accurate claim regarding what, if anything, the consumer's credit card issuers will do in regard to lowering the interest rates on the consumer's credit cards.

60.     Moreover, regardless of the consumer's individual economic, financial, credit, and personal circumstances, most credit card issuers are unlikely to agree to lower a typical consumer's interest rate down to as low as 0 to 6 percent, especially if the consumer is current on his or her payments.

12

61.     Although it is possible that a credit card issuer may agree to significant interest rate reductions for consumers who are more than 90 days overdue on their payments as a result of a severe economic crisis (e.g., a job loss), in such circumstances, issuers typically require such consumers to close all of their credit card accounts and not open any new credit accounts in order to obtain a significantly reduced interest rate.

62.     During Defendants' telemarketing calls, however, Defendants tell consumers that to qualify for Defendants' credit card interest rate reduction program the consumer must have at least one credit card that is in good standing.  Defendants explain to consumers that in order for the credit card to be in good standing, the consumer must be current on his or her payments on that card and not be over the card's credit limit.  Moreover, Defendants tell consumers that Defendants can obtain the substantially lowered credit card interest rates without having to close any of his or her existing credit cards.  With these conditions, it is extremely unlikely, if not impossible, that any credit card issuer would agree to a significant interest rate reduction for any consumer who meets Defendants' qualification criteria (i.e., is not delinquent or over the limit on at least one credit card account) and who does not want to close all of his or her existing credit cards.

63.     Accordingly, in truth and in fact, Defendants' claims that they can save any consumer thousands of dollars by substantially reducing the consumer's credit card interest rates are false and deceptive.

### Defendants Rarely Issue Refunds

64.     Consumers who seek a refund of the up-front fee Defendants collect often have to file multiple refund requests with Defendants or complain, or threaten to complain, to law enforcement, their credit card companies, or the Better Business Bureau before Defendants give any refunds.

65.     Consumers who do not make multiple refund requests or complain, or threaten to complain to law enforcement, their credit card companies, or the Better Business Bureau often do not receive refunds.

### Defendants' Abusive Telemarketing Practices

66.     While telemarketing their program, Defendants, acting directly or through one or more intermediaries, have made numerous calls to telephone numbers on the National Do Not Call Registry ("Registry").

67.     In numerous instances, Defendants, acting directly or through one or more intermediaries, also "spoof" their calls by transmitting phony Caller ID information so that call recipients do not know the source of the calls.

68.     In numerous instances, Defendants, acting directly or through one or more intermediaries, have initiated telemarketing calls that failed to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call:  the identity of the seller; that the purpose of the call is to sell goods or services; or the nature of the goods or services.

69.     In numerous instances, Defendants, acting directly or through one or more intermediaries, have initiated prerecorded telemarketing calls to consumers that failed to promptly disclose the identity of the seller; that the purpose of the call is to sell goods or services; the nature of the goods or services; or the mechanism for asserting a Do Not Call request.

70.     In numerous instances, Defendants, acting directly or through one or more intermediaries, have initiated telemarketing calls to consumers that deliver a prerecorded message without first having obtained the consumer's signed express written agreement to receive such calls by or on behalf of Defendants.

71.     Defendants, acting directly or through one or more intermediaries, have called

telephone numbers in various area codes without Defendants first paying the annual fee for access to the telephone numbers within such area codes that are included in the Registry.

## VIOLATIONS OF THE FTC ACT

72.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

73.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  15 U.S.C. § 45(a).

## COUNT ONE

### Misrepresentations in Violation of Section 5(a) (15 U.S.C. § 45(a))

74.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' credit card interest rate reduction services, Defendants have represented, directly or indirectly, expressly or by implication, that:

A.    Consumers who purchase Defendants' credit card interest rate reduction services will have their credit card interest rates reduced substantially, including to as low as 0% to 6%;

B.    Consumers who purchase Defendants' credit card interest rate reduction services will save thousands of dollars in a short time as a result of lowered credit card interest rates;

C.    Consumers who purchase Defendants' credit card interest rate reduction services will be able to pay off their debts much faster, typically three to five times faster, as a result of lowered credit card interest rates; and

D.    Consumers who purchase Defendants' credit card interest rate reduction services will be able to obtain lower interest rates on any credit card, regardless of the bank that issued the credit card.

15

75.     In truth and in fact, the representations set forth in Paragraph 74 of this Complaint were false or not substantiated at the time the representations were made.

76.     Therefore, Defendants' representations as set forth in Paragraph 74 of this Complaint are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### THE TELEMARKETING SALES RULE

77.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

78.     As amended, effective September 27, 2010, and October 27, 2010, the TSR addresses the telemarketing of debt relief services.  The amendments effective September 27, 2010, among other things, prohibit misrepresentations about material aspects of debt relief services.  The amendments effective October 27, 2010, prohibit sellers and telemarketers from charging or collecting an advance fee before renegotiating, settling, reducing, or otherwise altering consumers' debts.

79.     Defendants are "seller[s]" and/or "telemarketer[s]" engaged in "telemarketing" of "debt relief service[s]," and Defendants have initiated, or have caused telemarketers to initiate, "outbound telephone call[s]" to consumers to induce the purchase of goods or services, as those terms are defined in the TSR, 16 C.F.R. § 310.2(m), (v), (aa), (cc), and (dd).

80.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

81.     As amended, effective September 27, 2010, the TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service. 16 C.F.R. § 310.3(a)(2)(x).

82.     As amended, effective October 27, 2010, the TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt relief service before:  (a) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (b) the customer has made at least one payment pursuant to that agreement. 16 C.F.R. § 310.4(a)(5)(i).

83.     The TSR, as amended in 2003, established a "do-not-call" registry (the "National Do Not Call Registry" or "Registry"), maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at www.donotcall.gov.

84.     Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at www.donotcall.gov, or by otherwise contacting law enforcement authorities.

85.     The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at www.telemarketing.donotcall.gov, to pay any required fee(s), and to download the numbers not to call.

86.     The TSR prohibits sellers and telemarketers from calling any telephone number within a given area code unless the seller on whose behalf the call is made has paid the annual

fee for access to the telephone numbers within that area code that are included in the Registry. 16 C.F.R. § 310.8.

87.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to telephone numbers on the Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).

88.     The TSR requires that sellers and telemarketers transmit or cause to be transmitted the telephone number and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call, or transmit the customer service number of the seller on whose behalf the call is made and, when made available by the telemarketer's seller, the name of the seller.  16 C.F.R. § 310.4(a)(8).

89.     The TSR requires telemarketers in an outbound telephone call to disclose truthfully, promptly, and in a clear and conspicuous manner, the following information:

A.     The identity of the seller;

B.     That the purpose of the call is to sell goods or services; and

C.     The nature of the goods or services.

16 C.F.R. § 310.4(d).

90.     As amended, effective December 1, 2008, the TSR prohibits a telemarketer from engaging, and a seller from causing a telemarketer to engage, in initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the message promptly discloses:

A.     The identity of the seller;

B.     That the purpose of the call is to sell goods or services; and

C.     The nature of the goods or services.

16 C.F.R. § 310.4(b)(1)(v)(B)(ii).

91.     As amended, effective September 1, 2009, the TSR prohibits initiating a telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller.  The express agreement must include the recipient's telephone number and signature, must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.  16 C.F.R. § 310.4(b)(1)(v)(A).

92.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

## COUNT TWO

### Misrepresentations of Material Aspects of Performance of Goods and Services in Violation of the TSR (16 C.F.R. § 310.3(a)(2)(iii))

93.     In numerous instances, in connection with the telemarketing of good and services, Defendants have misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of such goods and services, including, but not limited to, that:

A.      Consumers who purchase Defendants' credit card interest rate reduction services will have their credit card interest rates reduced substantially, including to as low as 0% to 6%;

B.      Consumers who purchase Defendants' credit card interest rate reduction services will save thousands of dollars in a short time as a result of lowered credit card interest rates;

C.      Consumers who purchase Defendants' credit card interest rate reduction services will be able to pay off their debts much faster, typically three to five times faster, as a result of lowered credit card interest rates; and

D.      Consumers who purchase Defendants' credit card interest rate reduction services will be able to obtain lower interest rates on any credit card, regardless of the bank that issued the credit card.

94.     Defendants' acts and practices, as described in Paragraph 93 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §§ 310.3(a)(2)(iii).

## **COUNT THREE**

### **Misrepresentation of Material Aspects of Debt Relief Services in Violation of the TSR (16 C.F.R. § 310.3(a)(2)(x))**

95.     In numerous instances on or after September 27, 2010, in connection with the telemarketing of debt relief services, Defendants have misrepresented, directly or by implication, material aspects of the debt relief services, including, but not limited to, that:

A.      Consumers who purchase Defendants' credit card interest rate reduction services will have their credit card interest rates reduced substantially, including to as low as 0% to 6%;

B.      Consumers who purchase Defendants' credit card interest rate reduction

services will save thousands of dollars in a short time as a result of

lowered credit card interest rates;

C.      Consumers who purchase Defendants' credit card interest rate reduction

services will be able to pay off their debts much faster, typically three to

five times faster, as a result of lowered credit card interest rates; and

D.      Consumers who purchase Defendants' credit card interest rate reduction

services will be able to obtain lower interest rates on any credit card,

regardless of the bank that issued the credit card.

96.     Defendants' acts and practices, as described in Paragraph 95 above, are deceptive

telemarketing acts or practices that violate the TSR, 16 C.F.R. §§ 310.3(a)(2)(x).

## COUNT FOUR

### Charging or Receiving a Fee in Advance of
### Providing Debt Relief Services (16 C.F.R. § 310.4(a)(5)(i))

97.     In numerous instances on or after October 27, 2010, in the course of

telemarketing debt relief services, Defendants have requested or received payment of a fee or

consideration for a debt relief service before:  (a) they have renegotiated, settled, reduced, or

otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt

management plan, or other such valid contractual agreement executed by the customer; and (b)

the customer has made at least one payment pursuant to that agreement.

98.     Defendants' acts or practices, as described in Paragraph 97 above, are abusive

telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## COUNT FIVE

### Violating the National Do Not Call Registry (16 C.F.R. § 310.4(b)(1)(iii)(B))

99.     In numerous instances, in connection with telemarketing, Defendants have

engaged, or caused a telemarketer to engage, in initiating an outbound telephone call to a

person's telephone number on the National Do Not Call Registry in violation of the TSR, 16

C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT SIX

### Failing to Transmit Caller Identification (16 C.F.R. § 310.4(a)(8))

100.     In numerous instances, in connection with telemarketing, Defendants have failed

to transmit, or have caused telemarketers to fail to transmit, the telephone number and name of

the telemarketer or of Defendants to any caller identification service in use by a recipient of a

telemarketing call, in violation of the TSR, 16 C.F.R. § 310.4(a)(8).

## COUNT SEVEN

### Initiating Unlawful Prerecorded Messages (16 C.F.R. § 310.4(b)(1)(v))

101.     In numerous instances on or after September 1, 2009, Defendants have made, or

caused others to make, outbound telephone calls that delivered prerecorded messages to induce

the purchase of goods or services in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v).

## COUNT EIGHT

### Failing to Make Required Oral Disclosures (16 C.F.R. §§ 310.4(b)(1)(v)(B)(ii) and (d))

102.     In numerous instances, including on or after December 1, 2008, in the course of

telemarketing goods and services, Defendants have made, or caused others to make, outbound

telephone calls that deliver a prerecorded message in which the telemarketer or message failed to

disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the

call:

> A.     The identity of the seller;

> B.     That the purpose of the call is to sell goods or services; or

> C.     The nature of the goods or services.

103.    Defendants' acts and practices, as alleged in Paragraph 102 above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. §§ 310.4(b)(1)(v)(B)(ii) and (d).

## COUNT NINE

### Failing to Pay National Registry Fees (16 C.F.R. § 310.8)

104.    In numerous instances, in connection with telemarketing, Defendants have initiated, or caused others to initiate, an outbound telephone call to a telephone number within a given area code when Defendants had not, either directly or through another person, paid the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.8.

## CONSUMER INJURY

105.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts and practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

106.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

107.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court

finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and the appointment of a receiver;

B.      Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated:  October 23, 2012

Respectfully submitted,

WILLARD K. TOM
General Counsel

Bikram Bandy
Tel:  (202) 326-2978
E-mail:  bbandy@ftc.gov

William T. Maxson
Tel:  (202) 326-2635
E-mail:  wmaxson@ftc.gov

Federal Trade Commission
600 Pennsylvania Ave., NW, Mail Stop H-286
Washington, DC 20580
Fax:  (202) 326-3395

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION