UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____- CV - _____

**FEDERAL TRADE COMMISSION,**

     Plaintiff,

   v.

**A+ FINANCIAL CENTER, LLC,** a Florida
limited liability company, also doing business as
**ACCELERATED FINANCIAL CENTERS,
LLC,**

**ACCELERATED ACCOUNTING SERVICES
LLC,** a Florida limited liability company,

**CHRISTOPHER L. MIANO,** individually and
as the managing member of Accelerated
Accounting Services LLC, and

**DANA M. MIANO,** individually and as the
managing member of A+ Financial Center, LLC,

     Defendants.

**FILED UNDER SEAL**

## FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, APPOINTMENT OF A RECEIVER, IMMEDIATE ACCESS, AND OTHER EQUITABLE RELIEF, AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION.................................................................................................1

II.     STATEMENT OF FACTS ................................................................................... 3

     A.     The Parties.............................................................................................3

          1.     The Federal Trade Commission..............................................3

          2.     Defendants...............................................................................3

     B.     Defendants' Business Practices...........................................................5

          1.     Defendants Use Illegal Telemarketing Calls to Initiate
               Contact With Consumers.......................................................5

          2.     Defendants Hide Their True Identity....................................... 6

          3.     Defendants Make Grandiose Guarantees and Collect an
               Up-Front Fee From Consumers.............................................7

          4.     Defendants Reiterate Their Guarantees in Their Written
               Materials..............................................................................11

          5.     Defendants Are Unable to Deliver the Promised Interest
               RateReductions....................................................................12

          6.     Defendants' Claims are False and Deceptive........................... 13

          7.     Defendants Rarely Issue Refunds...........................................15

          8.     Defendants Have Taken Millions of Dollars from
               Numerous Financially Distressed Consumers Through
               Their Scheme.......................................................................15

     C.     State Law Enforcement Actions........................................................17

III.    A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST
    ALL DEFENDANTS......................................................................................... 18

     A.     This Court Has the Authority to Grant the Requested Relief...............19

     B.     The FTC Meets the Standard for Granting a Government
        Agency's Request for a Preliminary Injunction....................................20

i

1.    The FTC Has Demonstrated That It Is Likely to Succeed
      on the Merits....................................................................................20

      a.    Defendants Have Violated the FTC Act.........................................21

      b.    Defendants Have Violated the TSR................................................24

2.    The Equities Tip Decidedly in the Public's Favor....................................26

C.    An Ex Parte TRO With Additional Equitable Relief Is Necessary
      To Stop Defendants' Unlawful Conduct and Preserve Effective
      Financial Relief...................................................................................27

      1.    The TRO Should Enjoin Defendants From Violating the
            FTC Act and the TSR........................................................................28

      2.    The TRO Should Freeze Defendants' Assets...........................................30

      3.    The TRO Should Appoint a Temporary Receiver for the
            Corporate Defendants........................................................................34

      4.    The TRO Should Grant Expedited Discovery and Immediate
            Access to Defendants' Business Premises.................................................35

      5.    The TRO Should be Issued Ex Parte.......................................................35

IV.    CONCLUSION................................................................................... 36

## TABLE OF AUTHORITIES

### CASES

*American Can Co. v. Mansukhani*,
 742 F.2d 314 (7th Cir. 1984).................................................................35

*AT&T Broadband v. Tech Commc'ns, Inc.*,
 381 F.3d 1309 (11th Cir. 2004)...........................................................19

*Cenergy Corp. v. Bryson Oil & Gas P.L.C.*,
 657 F. Supp. 867 (D. Nev. 1987)..........................................................36

*FTC v. 1268957 Ontario Inc.*,
 No. 01-CV-00423-JEC (N.D. Ga. Feb. 13, 2001)...........................28

*FTC v. 1st Guar. Mortgage Corp., et al.*,
 No. 09-CV-61840-JJO (S.D. Fla. Nov. 25, 2009)..........................20

*FTC v. 1st Guar. Mortgage Corp*,
 No. 09-CV-61840-JJO, 2011 WL 1233207 (S.D. Fla. Mar. 30, 2011)............................29

*FTC v. 2145183 Ontario Inc.*,
 No. 09-CV-07423 (N.D. Ill. 2009)..........................................................2

*FTC v. Advanced Management Services. NW, LLC*,
 No. 10-CV-148 (E.D. Wash. 2010)........................................................2

*FTC v. Affordable Media*,
 179 F.3d 1228 (9th Cir. 1999)..............................................................33

*FTC v. American Precious Metals, LLC*,
 No. 11-CV-61072-RNS (S. D. Fla. May 10, 2011).........................19

*FTC v. Amy Travel Service, Inc.*,
 875 F.2d 564 (7th Cir. 1989) ......................................23, 28, 29, 33

*FTC v. Capital Choice Consumer Credit, Inc.*,
 No. 02-CV-21050, 2004 WL 5149998 (S.D. Fla. 2004)..................27

*FTC v. Cyberspace.com, LLC*,
 453 F.3d 1196 (9th Cir. 2006)..............................................................21

*FTC v. Direct Financial Management Inc.*,
 No. 10-CV-07194 (N.D. Ill. 2010)..........................................................2

*FTC v. Direct Marketing Concepts, Inc.*,
   624 F.3d 1 (1st Cir. 2010)..........................................................................21-22

*FTC v. Economic Relief Technologies, LLC*,
   No. 09-CV-3347 (N.D. Ga. 2009)........................................................................2

*FTC v. Figgie International, Inc.*,
   994 F.2d 595 (9th Cir. 1993)......................................................................21, 22

*FTC v. First Universal Lending, LLC, et al.*,
   No. 09-CV-82322-WJZ (S.D. Fla. Nov. 19, 2009).............................................20

*FTC v. Five-Star Auto Club*,
   97 F. Supp. 2d 502 (S.D.N.Y. 2000)...........................................................28-29

*FTC v. Freecom Communications, Inc.*,
   401 F.3d 1192 (10th Cir. 2005)............................................................22, 24, 29

*FTC v. FTN Promotions, Inc.*,
   No. 07-CV-1279, 2008 WL 821937 (M.D. Fla. March 26, 2008)......................33

*FTC v. Gem Merchandising Corp.*,
   87 F.3d 466 (11th Cir. 1996).....................................................19, 29, 30, 33

*FTC v. H.N. Singer, Inc.*,
   668 F.2d 1107 (9th Cir. 1982)...........................................................................28

*FTC v. IAB Marketing Associates, LP, et al.*,
   No 12-CV-61830-RNS (S.D. Fla. Sept. 18, 2012)............................................19

*FTC v. J.K. Publications, Inc.*,
   99 F. Supp. 2d 1176 (C.D. Cal. 2000)...............................................................27

*FTC v. Jordan Ashley*,
   No. 93-CV-2257, 1994 U.S. Dist. LEXIS 7494 (S.D. Fla. Apr. 5, 1994).........33

*FTC v. JPM Accelerated Services, Inc.*,
   No. 6:09-cv-02021-JA-KRS (M.D. Fla. 2009)...................................................2

*FTC v. Kirkland Young, LLC, et al.*,
   No. 09-CV-23507-ASG (S.D. Fla. Nov. 19, 2009)............................................20

*FTC v. Mallett*,
   818 F. Supp. 2d 142 (D.D.C. 2011)...................................................................20

*FTC v. Mountain View Systems, Ltd., et al.,*
No. 03-CV-0021-RMC (D.D.C. Jan. 9, 2003)..................................................28

*FTC v. Pantron I Corp.,*
33 F.3d 1088 (9th Cir. 1994)..................................................23

*FTC v. People Credit First, LLC,*
244 Fed. Appx. 942 (11th Cir. 2011)..................................................21

*FTC v. Pereira,*
No. 99-CV-01367-AVB (E.D. Va. Sep. 14, 1999)..................................................28

*FTC v. Premier Precious Metals, Inc., et al.,*
No. 12-CV-60504-RNS (S.D. Fla. Mar. 20, 2012)..................................................19

*FTC v. Prime Legal Plans LLC, et al.,*
No. 12-CV-61872-RNS (S.D. Fla. Sept. 24, 2012)..................................................19

*FTC v. Publishing Clearing House, Inc.,*
104 F.3d 1168 (9th Cir. 1997)..................................................32-33

*FTC v. RCA Credit Services, LLC,*
727 F. Supp. 2d 1320 (M.D. Fla. 2010)..................................................21, 23

*FTC v. Security Rare Coin & Bullion Corp.,*
931 F.2d 1312 (8th Cir. 1991)..................................................22

*FTC v. SlimAmerica, Inc.,*
77 F. Supp. 2d 1263 (S.D. Fla. 1999)..................................................23

*FTC v. Stefanchik,*
559 F.3d 924 (9th Cir. 2009)..................................................21

*FTC v. Stuffingforcash.com Corp.,*
No. 02-CV-05022-CRN (N.D. Ill. July 16, 2002)..................................................28

*FTC v. Tashman,*
318 F.3d 1273 (11th Cir. 2003)..................................................21, 23

*FTC v. Timeshare Mega Media & Marketing Group, Inc., et al.,*
10-CV-62000-WJZ (S.D. Fla. Oct. 20, 2010)..................................................19-20

*FTC v. TLD Network Ltd.,*
No. 02-CV-01475-JFH (N.D. Ill. Feb. 28, 2002)..................................................28

*FTC v. Transnet Wireless Corp.*,
    506 F. Supp. 2d 1247 (S.D. Fla. 2007)..................................................................3, 21, 22, 29

*FTC v. University Health, Inc.*,
    938 F.2d 1206 (11th Cir. 1991)..................................................................20

*FTC v. U.S. Mortgage Funding, Inc., et al.*,
    No. 11-CV-80155-JIC (S.D. Fla. Feb. 20, 2011)................................19

*FTC v. U.S. Oil & Gas Corp.*,
    748 F.2d 1431 (11th Cir. 1984)..................................................................19, 30, 34

*FTC v. USA Beverages, Inc.*,
    No. 05-CV-61682, 2005 WL 5654219 (S.D. Fla. Dec. 6, 2005)..................21, 26

*FTC v. USA Financial, LLC*,
    415 Fed. Appx. 970 (11th Cir. 2011)..................................................19, 22, 23

*FTC v. Verity International, Ltd.*,
    443 F.3d 48 (2d Cir. 2006)..................................................................22

*FTC v. VGC Corp. of America, et al.*,
    No. 11-CV-21757-JEM (S.D. Fla. May 17, 2011)................................19

*FTC v. Wilcox*,
    926 F. Supp. 1091 (S.D. Fla. 1995)..................................................................29

*FTC v. Wolf*,
    No. 94-CV-8119, 1996 WL 812940 (S.D. Fla. Jan. 30, 1996)................27

*FTC v. World Travel Vacation Brokers, Inc.*,
    861 F.2d 1020 (7th Cir. 1988)..................................................................20, 26, 31, 33

*FTC v. World Wide Factors, Ltd.*,
    882 F.2d 344 (9th Cir. 1989)..................................................................20, 26

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters*,
    415 U.S. 423 (1974)..................................................................35

*In re Vuitton et Fils, S.A.*,
    606 F.2d 1 (2d Cir. 1979)..................................................................35-36

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009)..................................................................31

*Kraft, Inc. v. FTC,*
    970 F.2d 311 (7th Cir. 1992)...............................................................................21

*Leone Industries v. Associated Packaging, Inc.,*
    795 F. Supp. 117 (D.N.J. 1992).........................................................................34

*Levi Strauss & Co. v. Sunrise International Trading, Inc.,*
    51 F.3d 982 (11th Cir. 1995)................................................................................1

*Novartis Corp. v. FTC,*
    223 F.3d 783 (D.C. Cir. 2000)...........................................................................21

*Orkin Exterminating Co. v. FTC,*
    849 F.2d 1354 (11th Cir. 1988)..........................................................................33

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946)...........................................................................................35

*Removatron International Corp. v. FTC,*
    884 F.2d 1489 (1st Cir. 1989)............................................................................22

*SEC v. First Financial Group of Texas,*
    645 F.2d 429 (5th Cir. 1981).......................................................................31, 34

*SEC v. Keller Corp.,*
    323 F.2d 397 (7th Cir. 1963)..............................................................................34

*SEC v. Manor Nursing Centers, Inc.,*
    458 F.2d 1082 (2d Cir. 1972)......................................................................31, 32

*SEC v. R.J. Allen & Associates,*
    386 F. Supp. 866 (S.D. Fla. 1974)...............................................................27, 31

*Sunshine Art Studios, Inc. v. FTC,*
    481 F.2d 1171 (1st Cir. 1973)............................................................................27

*United States v. Diapulse Corp. of America,*
    457 F.2d 25 (2d Cir. 1972).................................................................................26

*United States v. First National City Bank,*
    379 U.S. 378 (1965)...........................................................................................31

## FEDERAL STATUTES

15 U.S.C. § 41 *et seq.*...........................................................................................3

15 U.S.C. § 45(a)............................................................................................2, 3, 21

15 U.S.C. § 53(b)...............................................................................................3, 19

15 U.S.C. § 56(a)(2)(A).........................................................................................3

15 U.S.C. § 56(a)(2)(B).........................................................................................3

15 U.S.C. § 57b.....................................................................................................3

15 U.S.C. § 6101 *et seq*........................................................................................3

15 U.S.C. § 6102(c)...............................................................................................3

15 U.S.C. § 6105(b)...............................................................................................3

## FEDERAL REGULATIONS

16 C.F.R. Part 310...............................................................................................2, 3

16 C.F.R. § 310.2(m)............................................................................................24

16 C.F.R. § 310.3(a)(2)(iii)...................................................................................24

16 C.F.R. § 310.3(a)(2)(x)....................................................................................24

16 C.F.R. § 310.4(a)(5)(i)................................................................................24, 25

16 C.F.R. § 310.4(a)(8).........................................................................................25

16 C.F.R. § 310.4(b)(1).........................................................................................18

16 C.F.R. § 310.4(b)(1)(iii)(B)..............................................................................25

16 C.F.R. § 310.4(b)(1)(v)....................................................................................25

16 C.F.R. § 310.4(d)........................................................................................18, 25

16 C.F.R. § 310.8..................................................................................................25

*Telemarketing Sales Rule*, 75 Fed. Reg. 48464, 48465 (Aug. 10, 2010).......................25

## FEDERAL RULES

Fed. R. Civ. P. 26(d).............................................................................................35

Fed. R. Civ. P. 33(a)...........................................................................................................35

Fed. R. Civ. P. 34(b)...........................................................................................................35

**STATE STATUTES**

West Virginia Code § 46A-6F-401(a)...................................................................................17

## I.   **INTRODUCTION**

The Federal Trade Commission ("FTC") respectfully requests that the Court immediately stop a telemarketing scam that takes advantage of financially distressed consumers who are struggling to manage high credit card debt.[1]  In this scheme, Defendants have placed hundreds of thousands of illegal telemarketing calls – most of which start with illegal prerecorded "robocalls"[2] – to consumers all across the country to sell phony credit-card interest rate reduction services.  When consumers press "1" on their phones to speak to a live representative, consumers are connected to one of Defendants' telemarketers who "guarantees" that, in exchange for an up-front fee ranging from $495 to $1,595, Defendants can save them thousands of dollars and help them get out of debt faster by substantially reducing the interest rates on their credit cards to extraordinarily low rates such as 6% or even 0%.  Defendants' program, however, is nothing more than a dead end for consumers in financial distress because Defendants rarely, if ever, are able to deliver the interest rate reductions they promise to consumers who pay their fee.  This is not surprising because most banks will not agree to lower a financially distressed consumer's credit card interest rates at all or, at most, will only agree to a very modest interest rate reduction

---

[1] The FTC submits four volumes of exhibits in support of its Motion:  Volume 1 contains sworn declarations from sixteen consumer victims; Volume 2 contains documents and declarations relating to the FTC's investigation of Defendants, including an analysis of Defendants' corporate banking records by an FTC forensic accountant and transcripts of three undercover calls between Defendants' telemarketers and an FTC investigator posing as consumer seeking to obtain lowered credit card interest rates; Volume 3 contains documentary evidence that the FTC received from state agencies; and Volume 4 contains declarations from a credit card issuer, consumer credit reporting agencies, and the U.S. Postal Inspection Service.  All exhibits cited in this Memorandum are referenced as "PX [volume number] – [exhibit number]."

In considering an application for a TRO or preliminary injunction, the Court "may rely on affidavits and hearsay materials" if appropriate.  *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

[2] A "robocall" as used herein refers to a telemarketing call that delivers a prerecorded message when answered by a consumer.

that falls far short of the significantly low interest rates Defendants guarantee in their calls.  In

short, most consumers who pay Defendants' hefty up-front fee end up with little to show for it,

as they save little to no money, are unable to get out of debt any faster, and do not receive the

lowered credit card interest rates Defendants promised them.  Defendants' practices, which are

nearly identical to those that have been the subject of previous FTC enforcement actions,[3] violate

Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), which

prohibits deceptive acts or practices in or affecting commerce, as well as numerous provisions of

the FTC's "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310.

Because Defendants' conduct has injured numerous financially distressed consumers

across the country and continues to harm additional consumers on a daily basis, the FTC seeks

an *ex parte* temporary restraining order ("TRO") that will immediately halt Defendants'

deceptive and injurious practices and preserve assets for potential redress to consumer victims.

Specifically, the FTC seeks an *ex parte* TRO that enjoins Defendants from continuing their

illegal practices and orders ancillary equitable relief, including:  an asset freeze; the appointment

of a temporary receiver; immediate access to relevant business premises and records; limited

expedited discovery; and an order to show cause why a preliminary injunction should not issue.

These measures are necessary to prevent continued consumer injury, dissipation of assets, and

---

[3] *See, e.g., FTC v. Direct Fin. Mgmt. Inc.*, No. 10-CV-07194 (N.D. Ill. 2010) (imposing $13.1 million judgment on defendants engaged in bogus credit card interest rate reduction scheme than victimized more than 13,000 consumers); *FTC v. Advanced Mgmt. Servs. NW, LLC*, No. 10-CV-148 (E.D. Wash. 2010) (imposing $13.8 million judgment against defendants engaged in bogus credit card interest rate reduction scheme); *FTC v. JPM Accelerated Servs., Inc.*, No. 6:09-cv-02021-JA-KRS (M.D. Fla. 2009) (imposing $9.1 million in judgments against defendants engaged in bogus credit card interest rate reduction scheme); *FTC v. 2145183 Ontario Inc.*, No. 09-CV-07423 (N.D. Ill. 2009) (imposing $8.3 million judgment against defendants engaged in a credit card interest rate reduction scheme); *FTC v. Economic Relief Techs., LLC*, No. 09-CV-3347 (N.D. Ga. 2009) (imposing $25 million judgment against defendants engaged in credit card interest rate reduction scheme).

destruction of evidence, thereby preserving this Court's ability to provide effective final relief to the victims of Defendants' scheme.

## II.   STATEMENT OF FACTS

### A.   The Parties

#### 1.   The Federal Trade Commission

The FTC is an independent agency of the United States government created by statute. 15 U.S.C. § 41 *et seq.* The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. § 6101 *et seq.*, and the TSR, 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing acts or practices. The FTC is authorized to initiate United States District Court proceedings by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including consumer redress. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), & 6105(b); *see FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1252-53 (S.D. Fla. 2007).

#### 2.   Defendants

Defendants **A+ Financial Center, LLC ("A+")** and **Accelerated Accounting Services LLC ("Accelerated Accounting")** are both Florida limited liability companies. (PX 2-6; PX 2-7.) A+ was initially formed as Accelerated Financial Centers, LLC, on July 22, 2008, but changed its name to A+ on February 9, 2010. (PX 2-6 at FLSTATE 000008.) Accelerated Accounting was formed on October 6, 2009. (PX 2-6 at FLSTATE 000017.) A+ operates its business at 10258 S. US Highway 1, Port Saint Lucie, Florida 34952, while Accelerated Accounting lists its business address as 10256 S. US Highway 1, Port Saint Lucie, Florida 34952. (PX 2-6 at FLSTATE 000012; PX 2-7.) Although A+ and Accelerated Accounting

3

technically have different addresses, the two locations are part of one contiguous office space located in the same strip mall in Port Saint Lucie, Florida, and A+ has listed its mailing address . (PX 4-7.)

Defendant **Christopher L. Miano ("Chris Miano")** is the general manager of both A+ and Accelerated Accounting.  (PX3-3 at DOACS 000194.)  In his role as general manager, Chris Miano runs both A+ and Accelerated Accounting on a day-to-day basis including, among other things:  managing all employees; handling the finances of the business; and addressing regulatory compliance with state authorities.  (*Id.*)  Chris Miano has signatory authority for bank accounts held in A+'s and Accelerated Accounting's names (PX 2-3 at BOFA-000012-13, 31, 34, 396-97, 413, 415, 505, 507, 793-94, 1383, 1385), has signed checks on behalf of A+ (PX 4-1 at WPBBB-000059, 64), and has signed responses submitted to the Better Business Bureau as the "GM" of A+ (*Id.* at WPBBB-000005, 56, 62, 69, 73, 76, 118, 122, 124, 130).  Chris Miano is also listed as the subscriber for the telephone numbers used by A+ and Accelerated Accounting. (PX 2-4 at EARTHLINK 000001.)  Chris Miano is currently the sole Managing Member of Accelerated Accounting (PX 2-7 at FLSTATE 00020) and has previously served as the sole Managing Member of A+ (PX 2-6 at FLSTATE 000007).

Defendant **Dana M. Miano ("Dana Miano")** is the wife of Chris Miano, currently is the sole Managing Member of A+ (*id.* at FLSTATE 000015), and has been described by Chris Miano as the "owner" of A+ (PX 3-3 at DOACS 000194).  Dana Miano has signed numerous legal documents and regulatory filings on behalf of both A+ and Accelerated Accounting (*id.* at DOACS 000197-200; PX 2-6 at FLSTATE 000002, 5, 7, 10-11, 14-15; PX 2-7 at 17-18; PX 3-2 at DOACS 000097-103, 109-10, 112, 119, 150, 154, 173, 187), and she has signature authority on bank accounts held in the names of both A+ and Accelerated Accounting (PX 2-3 at BOFA-

000007-9, 31, 34, 413, 415-16, 473-75, 507-08, 1383, 1385).  Dana Miano is also listed as the

registrant and technical, billing, and administrative contact for A+'s website –

www.aplusfinancialcenters.com.  (PX 2-5 at GD004322.)  In addition, Dana Miano has

previously been the sole Managing Member of Accelerated Accounting.  (PX 2-7 at FLSTATE

000017-18.)

      B.      **Defendants' Business Practices**

            1.      **Defendants Use Illegal Telemarketing Calls to Initiate Contact With Consumers.**

Since at least November 2009, Defendants have been engaged in a telemarketing scheme

to sell financially distressed consumers bogus credit card interest rate reduction services.  As part

of this scheme, Defendants, either directly or through their telemarketers, have made hundreds of

thousands of illegal telemarketing calls to consumers (PX 2-1, ¶¶ 20-24 & Attachment I), many

of which are either robocalls or calls to phone numbers registered on the National Do Not Call

Registry (PX 1-1 to 1-3; PX 1-5; PX 1-7 to PX 1-16; PX 2-1, Attachment I).[4]  When consumers

answer these calls, they often hear a prerecorded message (often from a female who says her

name is "Rachel" from "Card Services") offering them the opportunity to lower the interest rates

on their credit cards substantially and instructing them to press "1" on their phone to be

connected to a live representative.  (PX 1-1 to 1-2; PX 1-7 to PX 1-9; PX 1-11; PX 1-13; PX 1-

15.)  If the consumer presses "1," he or she is connected to a live representative who works for

Defendants.[5]  (*Id.*)

_____

[4] There is no record of any Defendant having ever paid the annual fee to access telephone
numbers included on the National Do Not Call Registry.  (PX 2-1, ¶¶ 16-19.)

[5] Some consumers have reported that they received telemarketing calls that did not start with a
prerecorded message but rather were connected to a live representative that works for
Defendants as soon as they answered the phone.  (PX 1-3; PX 1-5; PX 1-10; PX 1-12; PX 1-14;
PX 1-16.)  These consumers, however, all had their phone numbers registered on the National

2.     **Defendants Hide Their True Identity.**

Once connected to a live representative, Defendants take numerous steps to hide their true identity and trick consumers into thinking that they are actually the consumer's bank or credit card company.  For example, in most cases, Defendants' live representative tells the consumer that he or she works for "Card Services," "Financial Center," or some other generic business name.  (PX 1-3; PX 1-11; PX 1-12; PX 1-15; PX 1-16.)  In fact, Defendants' internal training manual expressly instructs employees to refer to the company as "Card Services" and to reveal the company's real name and phone number only if the consumer provides a valid credit card.  (PX 3-3 at DOACS 000227.)  Moreover, numerous consumers report that the caller ID that accompanies Defendants' telemarketing calls says "Card Services" or "Financial Center," further causing consumers to think that the call is a legitimate one from the consumer's bank or credit card company.  (PX 1-3; PX 1-12.)  Defendants also give the appearance of legitimacy by often telling consumers that they obtained the consumer's information from a credit reporting agency such as Experian (PX 1-6; PX 1-7; PX 3-3 at DOACS 000226) or Equifax (PX 1-12; PX 2-1, Attachment D11), even though both Experian and Equifax have stated that they have never sold or provided Defendants with any information about any consumers (PX 4-4; PX 4-5).  Defendants' tactics work fairly well, as some consumers have stated that they initially thought that Defendants' telemarketing calls were actually legitimate calls from their banks or credit card issuers.  (PX 1-12; PX 1-16.)

---

Do Not Call Registry prior to receiving telemarketing calls from Defendants and had neither done any prior business with Defendants nor given Defendants permission to contact them.  (*Id.*)

3.    **Defendants Make Grandiose Guarantees and Collect an Up-Front Fee From Consumers.**

After gaining the consumer's trust by hiding their true identity, Defendants ask the consumer to provide a variety of information regarding the consumer's existing credit card debt, including how many credit cards the consumer has, the amount owed on each, and the interest rate.  (PX 1-2 to PX 1-16; PX 2-1, Attachment A6 to A7.)  After receiving this information, Defendants guarantee the consumer that:

- Defendants will reduce the interest rates on all of the consumer's credit cards, often quoting rates as low as 6% or even 0% and often claiming that the lowered rates will be permanent or will last for several years;

- Defendants will reduce the interest rate on any credit card, regardless of the bank that issued the card;

- Defendants' services will save the consumer thousands of dollars of interest, usually ranging between $1,200 to $4,000 in one year;

- The consumer will be able to get out of debt three to five times faster with Defendants' help; and

- Defendants will not require the consumer to close any of his or her existing credit cards in order to obtain the lowered interest rates.

(PX 1-2 to PX 1-4; PX 1-6 to 1-16; PX 2-1, Attachment A10 to A19.)  Defendants tell the consumer that all they need to qualify for Defendants' program is to have one credit card that is in "good standing," which Defendants explain requires that the consumer be current on his or her payments on the card and not be over the card's limit.  (PX 1-2; PX 1-3; PX 1-7; PX 2-1, Attachment A7; PX 3-3 at DOACS 000224.)

After making their grandiose guarantees, Defendants typically ask the consumer to provide his or her credit card number, expiration date, the bank's toll-free number on the back of the card, the last four digits of the consumer's social security number, and/or the consumer's zip code so that Defendants can determine whether the consumer "qualifies" or "is eligible" for one

of the "few remaining spots" in A+'s credit card interest rate reduction program.  (PX 1-2; PX 1-3; PX 1-7; PX 1-8; PX 1-10 to PX 1-12; PX 1-14 to PX 1-16; PX 2-1, Attachment A7 to A10.) Defendants then place the consumer on hold and call the bank that issued the consumer's credit card to determine:  (a) whether the consumer's credit card is in good standing (i.e., the account is still open and the consumer is current on his or her payments); and (b) whether the card has enough available credit to cover Defendants' up-front fee that ranges from $495 to $1,595.  (PX 2-1, Attachment A8 to A10; PX 3-3 at DOACS 000224.)

If the consumer provides a credit card to which Defendants can charge the entirety of its up-front fee, Defendants tell the consumer he or she has "qualified" (PX 1-2; PX 1-3; PX 1-7; PX 1-10 to 1-12; PX 1-15; PX 1-16; PX 2-1, Attachment A10), and Defendants then charge their fee to the consumer's credit card during or shortly after the call (PX 1-2 to PX 1-4; PX 1-6 to PX 1-8; PX 1-10 to PX 1-13; PX 1-15; PX 1-16; PX 2-1, ¶¶ 3, 6 & Attachment C).  If the consumer does not provide a card that can be charged Defendants' fee (e.g., the consumer's credit card is over the limit or has been closed), Defendants tell the consumer he or she has not qualified with that card and asks the consumer to provide another card to see if that card "qualifies."  (PX 1-3; PX 1-14; PX 1-6.)  If the consumer is ultimately unable or unwilling to provide a credit card to which A+ can charge its fee, the telemarketer tells the consumer he or she has not "qualified" and the call ends.  (PX 3-3 at DOACS 000224.)

Consumers who do "qualify" are immediately charged Defendants' fee *before* Defendants have undertaken any work to try to reduce the consumer's interest rates.  (PX 1-2 to PX 1-4; PX 1-6 to PX 1-8; PX 1-10 to PX 1-13; PX 1-15; PX 1-16; PX 2-1, ¶¶ 3, 6 & Attachment C.)  Defendants often tell consumers that, despite the fee, they will not incur any out-of-pocket expense because the amount of Defendants' fee will be offset quickly by the

savings consumers will receive through the significantly reduced interest rates Defendants will obtain for the consumer.  (PX 1-2; PX 1-3; PX 1-7; PX 1-10 to PX 1-12; PX 1-14 to PX 1-16.) Defendants further explain that if the consumer does not receive the guaranteed savings within one year as a result of lowered credit card interest rates obtained by Defendants, the consumer will receive a full refund of Defendants' fee.  (PX 1-2; PX 1-3; PX 1-7; PX 1-11; PX 1-16.)

Two recent calls between Defendants and an FTC investigator posing as a consumer seeking a lower interest rates on a Citi credit card illustrate the typical representations Defendants make to consumers during their telemarketing calls.  During the first call, the FTC investigator spoke to one of Defendants' telemarketers named Rachel who said the following:

> Our first guarantee is to show you a minimum savings of . . . $2,500. . . . Our second guarantee is to get you completely out of debt three to five times faster with no larger payment. . . .  In fact, when you have a lower interest rate, your minimum monthly payments will also be lower.
>
> * * *
>
> [A]s far as [your] Citi [credit card], you would be going down to a zero percent [rate] . . . . Zero percent would be for five years. . . . After the five years, if there's still a balance on that account, it would go to 3 percent. . . .  So, it will never be higher than three . . . . .
>
> * * *
>
> Now, for clients that do not qualify, they would actually have to send us a check or money order for a one-time processing fee of $795. . . .  Like I said, you do qualify, so you do not have to do that.  What we do for our qualified clients, such as yourself, is we absorb the $795 into the first $2,500 that we guarantee to save you. . . .  So, the only way we're able to do that without it coming out of your pocket is by applying the $795 to your overall credit card debt while you're paying a high interest rate, only because, by the following month, when we've lowered your rate, your minimum monthly payment will still be lower so the $795 is instantly absorbed. . . .

(PX 2-1, Attachment A11 to A12, A14 to A16.)  After signing up for Defendants' services, the same FTC investigator called Defendants about one month later and requested a refund.  The investigator spoke to a telemarketer named Richard Matthews, who made the following representations in an effort to talk the FTC investigator out of the refund request:

> MR. MATTHEWS:  Okay.  It looks like you only had one account . . . which showed about $11,200 and that is a Citi Visa and you're paying that off at 21 percent.  I do want to make sure, before we process [the refund request], that you understand exactly what you would be turning down.  I mean, you have been approved for a rate reduction at zero percent.  Keep in mind that that is a fixed rate. So, it's not as if, you know, you'd have zero percent for a year and then go back to 21 percent.  That would be zero percent not only for the current balance of $11,200, but also for your future purchases as well.
>
> So, just to kind of put that in hindsight for you, that means with our charge -- I've got $11,200, now you're at about $12,000.  Your payment before, just correct me if I'm wrong, at 20 percent, that means the  minimum payment they are sending you on each statement was going to be [roughly] $308 a month . . . .
>
> But due to the fact that you now have a rate of zero percent, your new minimum payment would be $120 for your next billing cycle. So, what you should actually be saving every month would be $188 in interest over the course of one year.  That is a savings of $2,256. . . .
>
> Now, by you saving $188 a month over the next four months, you're going to save $752.  So, that would pay for itself within four months and then every month after that, you would just have $188 coming back to you which you could either use for grocery, gas bills or if you do as we recommend and pay off your principal balance. . . .
>
> You understand that your payment next month would be lowered by $188?  . . . [W]e guarantee that. . . .
>
> * * *
>
> MR. MATTHEWS:  . . . . [I]t's a guarantee.  After you send [the paperwork] in to us, the rate's reduced within three to five business days. . . .   So, this doesn't take, you know, two, three, four months.  You're never going to have to pay any interest on [the

$795] charge.  You're on a 30-day grace period.  And like I said, by your next billing statement, you will see the savings immediately.

* * *

[FTC INVESTIGATOR]: . . . .  So, . . . it's 100 percent sure thing?

MR. MATTHEWS:  . . . .  Yeah, we have contracts with the lender.  We don't go in and ask them to lower the rates.  We purchase the rates up-front.  So, for example, in your case, what actually happened is your credit bureau, Equifax, called you since you did meet the criteria in terms of the two requirements that we have with the lenders in terms of our contract, that means your payment history as well as your credit rating.  So, because of that, you were approved to have the zero percent rate. . . .

[I]t depends on the lender that you're with, but being that you're with Citi, they have the lowest industry rates in the United States right now.  So, it is a guaranteed zero percent rate.

(PX 2-1, Attachment D5 to D7, D9 to D11.)

### 4.    Defendants Reiterate Their Guarantees in Their Written Materials.

A few days after the consumer is charged, Defendants send the consumer a written

package of materials that reiterates many of the same claims and guarantees Defendants made

during the initial telemarketing call.  (PX 1-2 to PX 1-4; PX 1-6 to PX 1-8; PX 1-10 to PX 1-12;

PX 1-14; PX 1-16; PX 2-1, ¶ 5 & Attachment B.)  For example, Defendants state in their written

materials that:

We are a fully Licensed and Bonded agency specializing in skillful debt reduction.  Our financial consultants will negotiate on your behalf with your creditors to reduce the high interest rates on your unsecured debt; and we will help build you a Personalized Debt Elimination Plan to get you out of debt three-to-five times faster than your current rate, saving you many thousands in other wise [sic] wasted interest payments!

(PX 1-3, Ex. A; PX 1-7, Ex. A; PX 1-8, Attachment A; PX 1-14, Ex. A; PX 2-1, ¶ 5 &

Attachment B.)  In the package, Defendants also promise the same guaranteed savings that they

11

told the consumer during the telemarketing call – i.e., Defendants guarantee in writing that the consumer will save somewhere between $1,200 to $4,000 in one year with the lowered interest rates that Defendants will obtain for the consumer or else the consumer will receive a full refund. (*Id.*)  Defendants' written materials also include several forms that ask the consumer to list all of his or her credit card numbers, interest rates, issuing bank names, credit limits, balances, and monthly payment amounts and to provide various types of personal financial information such as the consumer's annual household income and whether the consumer has ever filed for bankruptcy.  (*Id.*)  Defendants ask the consumer to complete the forms with his or her personal financial information and return the completed forms to Defendants in order to get started on the purported interest rate reductions.  (PX 1-2 to PX 1-4; PX 1-6; PX 1-7; PX 1-10 to PX 1-12; PX 1-14; PX 1-16; PX 2-1, Attachment A12 to A13.)

5.      **Defendants Are Unable to Deliver the Promised Interest Rate Reductions.**

If the consumer completes, signs, and returns the forms to Defendants, Defendants then undertake a few rudimentary efforts to make it seem like they are attempting to reduce the consumer's credit card interest rates as promised.  These efforts sometimes include setting up calls with the consumer's banks to ask for a lower interest rate (PX 1-3; PX 1-4) or advising the consumer to open a new credit card with an introductory interest rate and then transfer existing balances to the new card (PX 1-3; PX 1-4; PX 1-6; PX 1-14).[6]  These tactics, however, almost never succeed in obtaining any reduction in interest rates for the consumer, let alone the significant and long-term reductions and savings that Defendants promised in their initial call

---

[6] Defendants' tactic of having the consumer open a new introductory rate credit card and transfer existing balances to the card rarely works (PX 1-6) because "few if any consumers who carry high credit card balances versus their available credit or are delinquent on any credit accounts [are] able to credit-qualify for an additional credit card, including ones offering low or zero promotional rates for balance transfers."  (PX 4-2, ¶ 25.)

and in their written materials.  (PX 1-3; PX 1-4; PX 1-6.)  Thus, most consumers who end up being charged Defendants' up-front fee save little to no money, do not get out of debt any faster, and do not receive the lowered credit card interest rates that Defendants guaranteed.  (*Id.*)

### 6.   <u>Defendants' Claims are False and Deceptive.</u>

Defendants' inability to deliver the substantially lower interest rates and significant savings they promise during their calls is unsurprising.  As noted by Lisa T. Wilhelm, a consumer credit card industry expert (PX 4-2, ¶¶ 1-6 & Attachment A), without a detailed understanding of the consumer's individual economic, financial, credit, and personal circumstances – information Defendants do not obtain from the consumer during their telemarketing calls – it is impossible for Defendants to make any accurate claim regarding what, if anything, a consumer's credit card issuer will do to lower the interest rates on the consumer's credit card.  (*Id.* ¶ 22 ("In my experience, up front blanket representations and claims by a third party that guarantee a specific interest rate reduction, such as to as low as 0% or 7% . . . ., a minimum interest savings amount (e.g., $2,500 or more), or a two to five times faster debt payoff, would be impossible to deliver without a case-by-case assessment by the creditor.").  Moreover, even if Defendants did collect sufficient information from consumers during their calls, "any claims to reduce interest rates to as low as 0% to 7% are **totally unrealistic** . . . ." (*Id.* ¶ 25 (emphasis supplied).)  At most, a bank might agree under specific circumstances to a very modest (1 to 3 percent) reduction in interest rate for consumers who are in good standing on their accounts, although the chances of any interest rate reductions in the current credit environment for a consumer in good standing is "extremely low."  (*Id.* ¶¶ 22-23.)  As for consumers who are not in good standing (i.e., more than 90 days past due on their account), banks may agree in certain circumstances to a steep reduction in the consumer's interest rate on overdue balances, *but only if* the consumer agrees to a fixed repayment schedule, closes all of his

13

or her credit cards, and agrees not to open any new credit cards during the repayment term. (*Id.* ¶ 26.) Defendants, however, make crystal clear during their telemarketing calls that: (a) the consumer must be current on his or her credit card payments in order to qualify for Defendants' interest rate reduction program (PX 1-2; PX 1-3; PX 2-1, Attachment A7; PX 3-3 at DOACS 000224); and (b) the consumer will not have to close their credit card accounts in order to receive the lower interest rates promised by Defendants.  (PX 1-3; PX 2-1, Attachment A23.) Given these conditions, Defendants' claims of substantial savings and significantly reduced interest rates are inherently false and deceptive because, regardless of the consumer's individual economic, financial, credit, and personal circumstances, it is "totally unrealistic" that any bank would agree to lower a typical consumer's interest rate down to as low as 0 to 6 percent, especially for consumers who are current on their payments and want to keep using credit cards.

Ms. Wilhelm's claims are consistent with the practices of one major credit card issuer – Capital One.  (PX 4-3.)  Under Capital One's established procedures, Capital One may agree to a temporary reduction in interest rates not to exceed 12 months to consumers who can establish that they are suffering from a temporary financial hardship.  (*Id.* ¶ 6.a.)  For consumers who are delinquent and are suffering from a documented long-term financial hardship, Capital One may agree to a workout program under which Capital One restricts the consumer's charging privileges and the consumer agrees to pay back the outstanding balance with fixed monthly payments at a lowered interest rate over a fixed amount of time not to exceed 60 months.  (*Id.* ¶ 6.b.)  Most significantly, Capital One will consider workout requests made on behalf of a customer working a third-party consumer credit counseling service, but only if the service has been previously approved to work with Capital One.  (*Id.*)  None of the Defendants, however, are eligible to workout interest rate reductions from Capital One (*id.*) – a fact Defendants never

14

disclose during their telemarketing calls.  Moreover, Defendants are well aware of this fact given that Defendants have a list posted at their telemarketing stations entitled "Banks We Can't Work With (We Can Still Qualify These Cards)" that lists several banks, including Capital One.  (PX 3-3 at DOACS 000236.)  Despite the existence of this list, in numerous instances Defendants have collected their fee from consumers seeking to reduce the interest rates on their Capital One credit cards without ever disclosing the fact that Capital One will not work with Defendants on any long-term interest rate reductions for a Capital One customer.  (PX 1-3; PX 2-1, Attachment A13, D16.)

7.     **Defendants Rarely Issue Refunds.**

Once Defendants have failed to reduce the consumer's credit card interest rates to the levels promised during the initial call, Defendants usually stop communicating with the consumer.  Defendants sometimes do issue refunds to consumers, but only to those who either: (a) file multiple refund requests with A+; (b) report, or threaten to report, A+ to law enforcement or the Better Business Bureau; or (c) threaten to seek a charge-back from their credit card issuer. (PX 1-4; PX 1-6 to PX 1-8; PX 1-10 to PX 1-14.)  Presumably, Defendants issue refunds to consumers who complain to keep their charge-back rates low, maintain their Better Business Bureau rating, or avoid unwanted law enforcement attention.

8.     **Defendants Have Taken Millions of Dollars from Numerous Financially Distressed Consumers Through Their Scheme.**

Defendants' scheme has been immensely profitable.  Defendants' corporate banking records indicate that, since August 2008, Defendants have collected over $8 million dollars from consumers who have purchased Defendants' bogus credit card interest rate reduction services. (PX 2-2, ¶ 9.)  In addition, Defendants' corporate bank records indicate that Dana and Chris Miano are routinely withdrawing large sums of cash from the corporate bank accounts and using

funds in those accounts to pay numerous non-business expenses.  For example, Defendants' bank records reveal more that more than $650,000 in cash has been withdrawn from Defendants' corporate bank accounts via ATM transactions, withdrawals at bank teller windows, and checks made out to "cash."  (*Id.* ¶ 10.)  Defendants' corporate bank records also reveal more than $130,000 in wire transfers to a bank account located overseas (*id.* ¶ 11) and $98,000 in repeated and pervasive non-business expenditures for:  restaurant meals, liquor store purchases, gym memberships, bail bonds, limousines, gasoline and other automobile expenses, flowers, fishing or boating trips, department and specialty store expenditures, a cruise, a spa, resorts, travel and hotel costs, airfare, baseball tickets, nightclubs, movie tickets, theater tickets, grocery and pharmacy stores, golf, swimming pool supplies, haircuts, jewelry purchases, a casino/hotel facility, and a gentlemen's club (*id.* ¶ 15-16).  In short, the consistent and high volume of cash withdrawals, international wire transfers, and non-business-related expenditures from Defendants' corporate accounts strongly suggest that individual defendants Dana and Chris Miano (the lone signatories and authorized users on Defendants' bank accounts) are using Defendants' corporate accounts as their own personal piggy bank to pay for their personal expenses.

In addition, Defendants' scheme has ensnared a significant number of unsuspecting consumers.  More than one hundred consumers have filed complaints against Defendants with either the Better Business Bureau (PX 4-1) or the FTC (PX 2-1, ¶ 25), of which sixteen have submitted declarations that are attached to this motion (PX 1-1 to PX 1-16).  It is highly likely, however, that the actual number of consumers who have been duped into purchasing Defendants' bogus services is substantially higher than the number of complaints received given Defendants' gross revenues in excess of $8 million (PX 2-2, ¶ 9) and the fact that many consumers likely do

not file complaints against Defendants due to embarrassment.  Moreover, nearly all of the consumers who have filed complaints have reported receiving illegal telemarketing calls from Defendants (i.e., either robocalls or calls to numbers listed on the Do Not Call Registry), despite never having done any prior business with Defendants or given Defendants permission to contact them.  (PX 1-1 to PX 1-16.)  The 100+ robocall/do not call complaints, however, grossly understate the actual number of illegal telemarketing calls initiated by Defendants because many consumers who receive Defendants' illegal telemarketing calls are unable to file a complaint specifically identifying Defendants due to Defendants' pervasive practice of transmitting phony caller ID information with their telemarketing calls (PX 1-3; PX 1-12) and refusing to identify themselves until Defendants have determined that the consumer has a valid credit card that they can charge (PX 1-3; PX 1-11; PX 1-12; PX 1-15; PX 1-16; PX 3-3 at DOACS 000227).  In short, Defendants have made a lot of money by harassing substantial numbers of consumers with illegal telemarketing calls and preying on financially distressed consumers who believed Defendants' deceptive promises of financial relief through significant credit card interest rate reductions.

C.  **State Law Enforcement Actions**

Defendants have been the subject of two law enforcement actions relating to the same telemarketing practices at issue here.  For example, in March 2010, A+ and Chris Miano settled charges brought by the West Virginia Attorney General's office that alleged, among other things, that A+ had failed to make the mandatory disclosures required by West Virginia Code § 46A-6F-401(a), which requires telemarketers during telemarketing calls to promptly disclose their true identity and that the purpose of the call is to sell goods or services.  (PX 3-5, ¶ 13(d).)  As part of the settlement, A+ agreed to comply with the West Virginia law provisions and to repay amounts

it collected from West Virginia consumers. (*Id.* ¶¶ 17, 21.) The settlement was signed by Chris Miano, as "CEO" of A+. (*Id.* at 8.)

Similarly, on March 8, 2012, the State of Missouri filed a complaint against A+ and Chris Miano alleging that A+ and Chris Miano violated numerous provisions of Missouri's telemarketing and do not call laws. (PX 3-4.) Specifically, the Missouri action alleges that, since June 2011, A+ and Chris Miano: (A) made numerous unsolicited calls to numerous consumers in Missouri who had registered their telephone numbers on Missouri's No-Call List; and (B) during its telemarketing calls, A+ and Chris Miano failed to promptly disclose their actual name, that the purpose of the call was to make a sale, and that the calls were being made by a recorded voice communication. (*Id.* ¶¶ 20-31.) The Missouri action is still pending.

The two prior state law enforcement actions involved conduct that is not only illegal under West Virginia and Missouri law, but also illegal under federal telemarketing laws. *See, e.g.*, 16 C.F.R. §§ 310.4(b)(1) & (d). Despite having been the subject of two prior state enforcement actions, Defendants have continued to engage in the same telemarketing practices that were at issue in those actions, demonstrating that, without extraordinary relief, Defendants will continue to engage in their unlawful telemarketing practices.

## III.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST ALL DEFENDANTS.

As set forth below, and supported by the four volumes of evidence attached to the FTC's Motion, entry of an *ex parte* TRO against all Defendants in this action is critical and necessary to put an immediate stop to Defendants' ongoing violations of law, maintain the status quo until final adjudication of this matter, and preserve assets for potential redress to consumers who have been victimized by Defendants' scheme.

A.    **This Court Has the Authority to Grant the Requested Relief.**

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b),[7] authorizes the FTC to seek, and this

Court to grant, preliminary and permanent injunctive relief enjoining violations of Section 5 of

the FTC Act and "any ancillary relief necessary to accomplish complete justice." *FTC v. USA*

*Fin., LLC*, 415 Fed. Appx. 970, 976 (11th Cir. 2011); *AT&T Broadband v. Tech Commc'ns, Inc.*,

381 F.3d 1309, 1316 (11th Cir. 2004). The Court may also enter a temporary restraining order or

other preliminary relief to preserve the possibility of providing effective final relief. *FTC v. Gem*

*Merch. Corp.*, 87 F.3d 466, 468-69 (11th Cir. 1996); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d

1431, 1434 (11th Cir. 1984). Such ancillary relief is broad and may include an asset freeze to

preserve assets for restitution to victims, the appointment of a receiver, immediate access to

business premises, and expedited discovery – all forms of relief that this Court has granted in

other cases recently filed by the FTC.[8]

---

[7] This action is brought under the second proviso of Section 13(b), not the first proviso which addresses the circumstances under which the FTC can seek preliminary injunctive relief before or during the pendency of an administrative proceeding. Because the FTC brings this case pursuant to the second proviso of Section 13(b), its complaint is not subject to the procedural and notice requirements in the first proviso. *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) ("Congress did not limit the court's powers under the [second and] final proviso of § 13(b) and as a result this Court' inherent equitable powers may be employed to issue a preliminary injunction, including freezing of assets, during the pendency of an action for permanent injunctive relief.").

[8] *See, e.g., FTC v. Prime Legal Plans LLC, et al.*, No. 12-CV-61872-RNS (S.D. Fla. Sept. 24, 2012) (entering *ex parte* TRO granting asset freeze, immediate access, and expedited discovery and appointing receiver); *FTC v. IAB Mktg. Assocs., LP, et al.*, No 12-CV-61830-RNS (S.D. Fla. Sept. 18, 2012) (same); *FTC v. Premier Precious Metals, Inc., et al.*, No. 12-CV-60504-RNS (S.D. Fla. Mar. 20, 2012) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver); *FTC v. VGC Corp. of Am., et al.*, No. 11-CV-21757-JEM (S.D. Fla. May 17, 2011) (entering *ex parte* TRO granting asset freeze, immediate access, and expedited discovery, and appointing receiver); *FTC v. Am. Precious Metals, LLC*, No. 11-CV-61072-RNS (S. D. Fla. May 10, 2011) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver); *FTC v. U.S. Mortg. Funding, Inc., et al.*, No. 11-CV-80155-JIC (S.D. Fla. Feb. 20, 2011) (entering *ex parte* TRO granting asset freeze, immediate access, and expedited discovery and appointing receiver); *FTC v. Timeshare Mega Media & Mktg. Group*,

B.     **The FTC Meets the Standard for Granting a Government Agency's Request for a Preliminary Injunction.**

In considering a TRO or preliminary injunction under Section 13(b), this Court must: (1) determine the likelihood that the FTC will ultimately succeed on the merits; and (2) balance the equities. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991). The FTC, unlike private litigants, need not prove irreparable injury, which is presumed. *Id.* at 1218. In balancing the equities, "the public interest should receive greater weight" than any private interest. *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. USA Beverages, Inc.*, No. 05-CV-61682, 2005 WL 5654219, at *8 (S.D. Fla. Dec. 6, 2005); *see also FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011) ("The public interest in ensuring the enforcement of federal consumer protection law is strong."). As demonstrated below, an application of the above-mentioned two prong test to the circumstances of this case warrants the issuance of a temporary restraining order against the Defendants.

1.     **The FTC Has Demonstrated That It Is Likely to Succeed on the Merits.**

To demonstrate a likelihood of success on the merits, the FTC must show that it will likely prevail and need not present evidence to justify a "final determination" that Defendants violated the law, although the record here abounds with such evidence. *Univ. Health*, 938 F.2d at 1218. As set forth below, the FTC meets this requirement with ease and has shown that Defendants have violated and continue to violate: (a) Section 5 of the FTC Act; and (b) the TSR.

---

*Inc., et al.*, 10-CV-62000-WJZ (S.D. Fla. Oct. 20, 2010) (same); *FTC v. 1st Guar. Mortgage Corp., et al.*, No. 09-CV-61840-JJO (S.D. Fla. Nov. 25, 2009) (same); *FTC v. First Universal Lending, LLC, et al.*, No. 09-CV-82322-WJZ (S.D. Fla. Nov. 19, 2009) (same); *FTC v. Kirkland Young, LLC, et al.*, No. 09-CV-23507-ASG (S.D. Fla. Nov. 19, 2009) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver).

a.      **Defendants Have Violated the FTC Act.**

The voluminous evidence attached to the FTC's Motion demonstrates that Defendants

have violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits deceptive acts or

practices in or affecting commerce.  An act or practice is deceptive if it involves a material

misrepresentation or omission that is likely to mislead consumers acting reasonably under the

circumstances.  *FTC v. People Credit First, LLC*, 244 Fed. Appx. 942, 944 (11th Cir. 2011)

(following *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)).

A misrepresentation is material if it involves facts that a reasonable person would

consider important in choosing a course of action.  *See FTC v. Cyberspace.com, LLC*, 453 F.3d

1196, 1201 (9th Cir. 2006).  "Express claims, or deliberately made implied claims, used to

induce the purchase of a particular product or service are presumed to be material."  *Transnet

Wireless Corp.*, 506 F. Supp. 2d at 1266.  Implied claims are also presumed material if there is

evidence that the seller intended to make the claim, *see, e.g., Novartis Corp. v. FTC*, 223 F.3d

783, 786-87 (D.C. Cir. 2000); *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992), or if the

claims go to the heart of the solicitation or the central characteristics of the product or service

offered, *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993).  Moreover, in determining

whether a solicitation is likely to mislead consumers, courts consider the overall "net

impression" it creates.  *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla.

2010) (citing *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009)).  "A solicitation may be

likely to mislead by virtue of the net impression it creates even though the solicitation also

contains truthful disclosures."  *Id.* (quoting *Cyberspace.com*, 453 F.3d at 1200).

A representation is also deceptive if the maker of the representation lacks a reasonable

basis for the claim.  *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010).  Where

the maker lacks adequate substantiation evidence, they necessarily lack any reasonable basis for

their claims.  *Id.*; *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1498 (1st Cir. 1989).

The FTC need not prove that the misrepresentations were done with an intent to defraud or deceive, or were made in bad faith.  *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005).  Nor does the FTC need to show actual reliance by consumers; it is enough that the representations were likely to be relied on by consumers acting reasonably under the circumstances.  *Transnet Wireless*, 506 F. Supp. 2d at 1266-67; *see FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006); *Figgie Int'l*, 994 F.2d at 605 ("Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the foals of [Section 13(b)]."); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991).  "[A] presumption of actual reliance arises once the FTC has proved that the [d]efendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the [d]efendant's product."  *Figgie Int'l*, 994 F.2d at 605-06.

As demonstrated in the Statement of Facts and the evidence attached to the FTC's Motion, Defendants have made numerous misrepresentations in the course of telemarketing their credit card interest rate reduction services.  Specifically, Defendants have falsely represented to consumers, expressly or by implication, that:

- Consumers who purchase Defendants' credit card interest rate reduction services will have their credit card interest rates reduced substantially, including to as low as 0% to 6%;

- Consumers who purchase Defendants' credit card interest rate reduction services will save $1,200 to $4,000 in one year as a result of lowered credit card interest rates;

- Consumers who purchase Defendants' credit card interest rate reduction services will be able to pay off their debts much faster, typically three to five times faster, as a result of lowered credit card interest rates; and

- Consumers who purchase Defendants' credit card interest rate reduction services

22

> will be able to obtain lower interest rates on any credit card, regardless of the
> bank that issued the credit card.

*See supra* Section II.B.3.  These representations are false because most credit card issuers will

not agree to lower a consumer's credit card interest rates at all or, at most, will only agree to a

very modest interest rate reduction that falls far short of the significantly low interest rates

Defendants guarantee in their calls.[9]  *See supra* Section II.B.6.  Further, these misrepresentations

are presumed to be material because they are "used to induce the purchase of a particular product

or service." *RCA Credit Servs.*, 727 F. Supp. 2d at 1329 (citing *Tashman*, 318 F.3d at 1277); *see*

*also FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999).  Indeed, Defendants'

misrepresentations go to the very heart of the credit card interest rate reductions they sell and, as

reflected by the attached consumer declarations (PX 1-1 to PX 1-16) and the complaints that

consumer victims filed with the Better Business Bureau (PX 4-1), Defendants'

misrepresentations have, in fact, induced numerous consumers to pay significant sums for

Defendants' bogus services.[10]  Under these circumstances, there is a strong likelihood that the

---

[9] In addition, some credit card companies (e.g., Capital One) will not work with Defendants to
provide a long-term interest rate reduction on behalf of a consumer.  (PX 4-3, ¶ 6.b.)

[10] The FTC's investigation did not find any consumer for whom Defendants were actually able to
obtain significantly lowered credit card interest rates.  Nonetheless, it is possible that Defendants
may have been successful in obtaining significantly lowered interest rates for some consumers
who purchased their services.  The possible existence of a small percentage of "satisfied
customers," however, does not preclude a finding that the FTC will likely succeed on the merits.
*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989) ("The existence of some
satisfied customers does not constitute a defense under the FTC [Act].").

In addition, the fact that Defendants have issued refunds to some consumers is not a defense to
liability under Section 5(a) of the FTC Act.  *See SlimAmerica*, 77 F. Supp. 2d at 1272 ("The
existence of a money-back guarantee, such as the one alleged ... in this case, is neither a cure for
deception nor a remedy for consumer injury."); *see also FTC v. Pantron I Corp.*, 33 F.3d 1088,
1103 (9th Cir. 1994) ("[A]llowing a seller to rely on a money-back guarantee as a defense ...
'would make the false advertising prohibitions of the Act a nullity.  Anything might then be
advertised as long as unsatisfied customers were returned their money.'") (citations omitted);

FTC will succeed in proving that Defendants' acts and practices are deceptive in violation of Section 5(a) of the FTC Act.

### b.     <u>Defendants Have Violated the TSR.</u>

The evidence attached to the FTC's Motion also demonstrates that Defendants have violated numerous provisions of the TSR, which prohibits deceptive and abusive telemarketing acts or practices by telemarketers and sellers.

First, Defendants' false representations that they can reduce the interest rates on consumers' credit cards to between 0% and 6% regardless of the bank that issued the credit card and save consumers $1,200 to $4,000 in interest payments in one year violate Parts 310.3(a)(2)(iii) and 310.3(a)(2)(x) of the TSR, which prohibits Defendant from "[m]isrepresenting, directly or by implication, in the sale of goods or services . . . (iii) [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer [and] (x) [a]ny material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service [and] the amount of time necessary to achieve the represented results . . . ." 16 C.F.R. § 310.3(a)(2)(iii) & (x).[11]

In addition, Defendants' pervasive practice of collecting an up-front fee from the consumer before they have obtained lowered credit card interest rates on the consumer's credit cards (*see supra* Section II.B.3) violates Part 310.4(a)(5)(i) of the TSR, which prohibits

---

*Freecom Commc'ns*, 401 F.3d at 1206 ("The existence of a money-back guarantee is inadequate as a matter of law to preclude consumer redress in a § 5 action").

[11] Defendants' credit card interest rate reduction services constitute a "debt relief service," which is defined in the TSR as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors . . . , including, but not limited to, a reduction in the . . . interest rate . . . ." 16 C.F.R. § 310.2(m).

"[r]equesting or receiving payment of any fee . . . for any debt relief service until and unless . . . [t]he seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer [and] [t]he customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector . . . ." 16 C.F.R. § 310.4(a)(5)(i).[12]

Defendants have also violated the TSR by initiating, or causing a telemarketer to initiate, numerous telemarketing calls:

- to telephone numbers listed on the National Do Not Call Registry (*see supra* Sections II.B.1 & 8), in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B);

- that fail to provide an accurate caller identification name and telephone number (*see supra* Section II.B.2), in violation of 16 C.F.R. § 310.4(a)(8);

- that deliver prerecorded messages to consumers who had not previously provided Defendants with an express written agreement authorizing the placement of prerecorded calls to them (*see supra* Sections II.B.1 & 8), in violation of 16 C.F.R. § 310.4(b)(1)(v);

- that fail to disclose truthfully and promptly Defendants' true identity and that the purpose of the call is to sell goods or services (*see supra* Section II.B.2), in violation of 16 C.F.R. §§ 310.4(b)(1)(v)(B)(ii) and 310.4(d); and

- without first paying the required annual fee for access to the National Do Not Call Registry (PX 2-1, ¶¶ 16-19), in violation of 16 C.F.R. § 310.8.

In short, there is ample evidence indicating a strong likelihood that the FTC will succeed in proving that Defendants' telemarketing practices violate the TSR.

---

[12] The TSR's prohibition against collection of advance fees for debt relief services was implemented in 2010 specifically to respond to this common abusive practice in the industry. *See Telemarketing Sales Rule*, 75 Fed. Reg. 48464, 48465 (Aug. 10, 2010).

2.     **The Equities Tip Decidedly in the Public's Favor.**

       Given that the FTC has a strong likelihood of success on the merits, injunctive relief is warranted if the Court, weighing the equities, finds that relief is in the public interest. Here, the balance of equities mandates entry of a TRO and preliminary injunction because the public interest in preventing additional consumers from falling victim to Defendants' deceptive practices far outweighs any possible interest Defendants may have in continuing to operate their business deceptively. "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *World Wide Factors*, 882 F.2d at 347; *World Travel Vacation Brokers,* 861 F.2d at 1029; *USA Beverages,* 2005 WL 5654219, at *8. This preference for public equity is especially relevant here, where Defendants' business practices have already caused consumers to collectively lose millions of dollars and, if permitted to continue, will rob them of millions more. Moreover, without injunctive relief, Defendants will almost certainly continue to engage in their unlawful practices given that Defendants have already been subject to two state enforcement actions yet continue unabated in their deceptive and illegal scheme.

       In contrast, compliance with the law is hardly an unreasonable burden, and Defendants have no legitimate interest in continuing to engage in unlawful acts and practices. *See World Wide Factors*, 882 F.2d at 347 ("no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment"); *World Travel Vacation Brokers,* 861 F.2d at 1029. Defendants "can have no vested interest in a business activity found to be illegal." *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972) (internal quotations and citations omitted). In addition, it is likely that only the entry of the requested temporary and preliminary injunctive relief will prevent Defendants from continuing to deceive and harm the public during the

pendency of this litigation. *See SEC v. R.J. Allen & Assocs.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974) (noting that a defendant's past misconduct "gives rise to the inference that there is a reasonable likelihood of future violations.").

In sum, because the voluminous evidence attached to the FTC's Motion demonstrates that the FTC is likely to succeed on the merits, and the equities tip decidedly in the public's favor, a TRO is warranted.

C.    **An *Ex Parte* TRO With Additional Equitable Relief Is Necessary To Stop Defendants' Unlawful Conduct and Preserve Effective Financial Relief.**

In order to stop Defendants' unlawful activities and to preserve the Court's ability to grant the final relief sought, the Court should enter an *ex parte* TRO that: (1) prohibits Defendants from engaging in any conduct that violates the FTC Act or the TSR; (2) freezes Defendants' assets; (3) appoints a temporary receiver over Defendants A+ and Accelerated Accounting; and (4) grants the FTC and the temporary receiver immediate access to A+'s and Accelerated Accounting's records and authorizes expedited discovery.[13]

---

[13] Although there are two separate corporate Defendants in this matter – A+ and Accelerated Accounting – the distinction between them is a mere formality because they function as a common enterprise. "When determining whether a common enterprise exists, courts looks to a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through 'a maze of interrelated companies,' the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which 'reveals that no real distinction existed between the Corporate Defendants.'" *FTC v. Wolf*, No. 94-CV-8119, 1996 WL 812940, at *7-8 (S.D. Fla. Jan. 30, 1996); *see also Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1173-75 (1st Cir. 1973); *FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-CV-21050, 2004 WL 5149998, at *24 (S.D. Fla. 2004); *FTC v. J.K. Pub., Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000). Here, A+ and Accelerated Accounting operate as a common enterprise because, among other things, they share the same office location and employees, are commonly owned and controlled by Chris and Dana Miano, and provide the same credit card interest rate reduction services at issue here. (*See supra* Sec. II.A.2.) As such, A+ and Accelerated Accounting operate as a common enterprise and should therefore be jointly and severally liable with the individual Defendants for the conduct at issue in this case.

27

1.     **The TRO Should Enjoin Defendants From Violating the FTC Act and the TSR.**

    To prevent ongoing consumer injury, the Court should enter a TRO that immediately prohibits Defendants from engaging in any conduct that violates the FTC Act or the TSR including, but not limited to: (A) making misrepresentations concerning the provision of any debt relief services, including the credit card interest rate reduction program that Defendants market to consumers; (B) charging advance fees for debt relief services; (C) placing telemarketing calls to persons whose numbers are listed on the National Do Not Call Registry; (D) failing to transmit their telephone numbers and names to caller identification services; (E) placing outbound telemarketing calls that deliver prerecorded messages to consumers who had not previously provided Defendants with an express written agreement authorizing the placement of such calls to them; (F) making telemarketing calls in which Defendants fail to disclose truthfully and promptly their true identity and that the purpose of the calls is to sell goods or services; and (G) placing telemarketing calls to phone numbers without first paying the required annual fee for access to the National Do Not Call Registry.[14]  As discussed above, this Court has broad equitable authority under Section 13(b) of the FTC Act to grant ancillary relief necessary to accomplish complete justice. *Amy Travel*, 875 F.2d at 571-72; *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *see FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 532-39

---

[14] The Court should also enter a TRO that temporarily disables Defendants' website – www.aplusfinancialcenters.com – and suspends their domain name registrations to prevent further consumer injury because Defendants' website contains many of the same deceptive misrepresentations Defendants make during their telemarketing calls.  (PX 2-1, ¶ 14 & Attachments F9 to F11.)  Other courts have granted similar relief against defendants who have utilized Internet websites to promote fraud. *See, e.g., FTC v. Mountain View Systems, Ltd., et al.*, No. 03-CV-0021-RMC (D.D.C. Jan. 9, 2003); *FTC v. Stuffingforcash.com Corp.*, No. 02-CV-05022-CRN (N.D. Ill. July 16, 2002); *FTC v. TLD Network Ltd.*, No. 02-CV-01475-JFH (N.D. Ill. Feb. 28, 2002); *FTC v. 1268957 Ontario Inc.*, No. 01-CV-00423-JEC (N.D. Ga. Feb. 13, 2001); *FTC v. Pereira*, No. 99-CV-01367-AVB (E.D. Va. Sep. 14, 1999).

(S.D.N.Y. 2000). These requested prohibitions do no more than order that Defendants comply with the FTC Act and the TSR. Moreover, because Defendants have continued their unlawful business practices despite having notice that their activities are unlawful through two state law enforcement actions (*see supra* Section II.C) and numerous complaints that consumers have filed with the Better Business Bureau (PX 4-1), immediate injunctive relief is necessary to protect additional consumers from being harmed by Defendants' ongoing unlawful practices.

Furthermore, the injunctive relief should extend not only to the corporate Defendants, A+ and Accelerated Accounting, but also to the individual Defendants, Dana and Chris Miano. To obtain injunctive relief against an individual defendant for a corporate defendant's unlawful acts or practices, the FTC must show that the individual "participated directly" in those acts or practices or had "authority to control" the corporate defendant. *See Gem Merch.*, 87 F.3d at 470 (citing *Amy Travel*, 875 F.2d at 573); *USA Fin.*, 415 Fed. Appx. at 974-75; *FTC v. 1st Guar. Mortgage Corp*, No. 09-CV-61840, 2011 WL 1233207, at *15 (S.D. Fla. Mar. 30, 2011). "'Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.'" *FTC v. Wilcox*, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995) (quoting *Amy Travel*, 875 F.2d at 573). When an individual is a "controlling shareholder of [] corporate defendants," a "substantial inference" exists that the individual has "the authority to control the deceptive acts and practices carried on in the name of his corporations." *Freecom Commc'ns*, 401 F.3d at 1205; *see Transnet Wireless Corp.*, 506 F. Supp. 2d at 1270 ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation."). Furthermore, bank signatory authority or acquiring services on behalf of a corporation also evidences authority to control. *USA Fin.*, 415 Fed. Appx. at 974-75.

Here, both Chris and Dana Miano are subject to injunctive relief because they each participated directly in A+'s and Accelerated Accounting's unlawful acts and/or had the ability to control those entities.  Specifically, as previously described, Dana Miano:  is the sole corporate officer of A+; has been described by Chris Miano as the "owner" of A+;  previously was the sole corporate officer of Accelerated Accounting; has signed numerous legal documents and acquired services on behalf of A+ and Accelerated Accounting; is listed as the registrant for A+'s website; and has signatory authority over A+'s and Accelerated Accounting's bank accounts.  (*See supra* Section II.A.2.)  Similarly, as previously described, Chris Miano:  is the sole corporate officer of Accelerated Accounting; operates both A+ and Accelerated Accounting on a day-to-day basis; represents himself to be the general manager of A+; has signatory authority over A+'s and Accelerated Accounting's corporate bank accounts; and has signed numerous documents and acquired services on behalf of A+ and Accelerated Accounting.  (*See id.*)  These facts demonstrate that both Dana and Chris Miano undoubtedly have legal control of A+ and Accelerated Accounting and have, in fact, exercised such legal control on multiple occasions to direct the activities of those two entities.  As such, both are individually subject to injunctive relief stemming from A+'s and Accelerated Accounting's unlawful acts and practices.

## 2. **The TRO Should Freeze Defendants' Assets.**

As part of the permanent relief in this case, the FTC seeks monetary redress for consumers victimized by Defendants' unlawful practices.  To preserve the availability of funds to provide such equitable relief, the FTC requests that the Court issue an order requiring the preservation of assets and evidence.  The Eleventh Circuit has repeatedly upheld the authority of district courts to order an asset freeze to preserve the possibility of consumer redress (*see, e.g., Gem Merch. Corp.*, 87 F.3d at 469; *U.S. Oil & Gas Corp.*, 748 F.2d at 1433-34), and courts in this District have frozen defendants' assets in numerous FTC enforcement actions.  *See supra* n.

8. An asset freeze is appropriate once the Court determines that the FTC is likely to prevail on the merits and restitution would be an appropriate final remedy. *World Travel*, 861 F.2d at 1031.

"A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009); *see SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981). In *Johnson*, the Ninth Circuit upheld an asset freeze because plaintiffs had established they were "likely to succeed in proving that [the defendant] impermissibly awarded himself tens of millions of dollars." 572 F.3d at 1085. Courts have also concluded that an asset freeze is justified where a defendant's business is permeated with fraud. *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972); *First Fin. Group*, 645 F.2d at 438; *R.J. Allen & Assocs.*, 386 F. Supp. at 881. Further, the Court can order Defendants' assets to be frozen whether the assets are inside or outside the United States. *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965).

A freeze of the corporate Defendants' assets is needed here to preserve the status quo, ensure that funds do not disappear during the course of this action, and preserve the remaining assets for consumer redress and disgorgement. Such relief is critical here because, despite having taken millions of dollars from consumers through their deceptive scheme, Defendants' corporate bank accounts have less than $40,000 remaining in them as of July 31, 2012. (PX 2-2, ¶¶ 8-9.) This relatively low balance indicates a serious risk that there already may not be sufficient corporate assets remaining to provide consumer victims with full redress. As such, an asset freeze is critical to preserve whatever funds remain so that they can be used to pay redress to consumers injured by Defendants' unlawful conduct, and the balance of equities favors such relief.

Moreover, without an asset freeze, the dissipation and misuse of assets is likely. Defendants who have engaged in fraudulent or other serious law violations are likely to waste assets prior to resolution of the action. *See Manor Nursing Ctrs.*, 58 F.2d at 1106. The FTC's experience in prior cases confirms this, as numerous defendants in other cases who were engaging in similarly serious unlawful practices have dissipated assets upon learning of an impending law enforcement action. (Rule 65(B)(1) Certification of Federal Trade Commission Counsel Bikram Bandy in Support of Ex Parte Motion For A Temporary Restraining Order and Motion To Temporarily Seal Docket and Entire File ("Bandy Certification"), ¶¶ 18-20.) In addition, as previously indicated, Dana and Chris Miano have withdrawn over $650,000 in cash from Defendants' corporate accounts, wired more than $130,000 in corporate funds to an overseas bank account, and made over $98,000 in check purchases that do not appear to have any legitimate business purpose (PX 2-2, ¶¶ 10-16.) These withdrawals from the corporate bank accounts indicate that Chris and Dana Miano appear to be systematically using substantial portions of Defendants' corporate funds for their own personal use. Under these circumstances, the risk of dissipation is high, and a temporary asset freeze is therefore necessary to preserve the Court's ability to award consumer redress.

In addition, given that there is a significant risk that the corporate Defendants' assets may be insufficient to provide full consumer redress and that Chris and Dana Miano have systematically withdrawn significant amounts of corporate funds for their personal use, the asset freeze also should extend to the personal assets of Chris and Dana Miano to preserve the Court's ability to award full and effective final relief. An individual may be held liable for monetary redress for corporate practices if the individual had actual or constructive knowledge of the corporate defendant's misrepresentations. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168,

1171 (9th Cir. 1997); *Amy Travel*, 875 F.2d at 573.  The knowledge element does not require the FTC to prove subjective intent to defraud; rather, it may be satisfied by a showing of knowledge of material misrepresentations, reckless indifference to such misrepresentations, or an awareness of a high probability of deception along with an intentional avoidance of the truth.  *USA Fin.*, 415 Fed. Appx. at 974 (*citing Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1368 (11th Cir. 1988)); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. FTN Promotions, Inc.*, No. 07-CV-1279, 2008 WL 821937, at *2 (M.D. Fla. March 26, 2008); *FTC v. Jordan Ashley*, No. 93-CV-2257, 1994 U.S. Dist. LEXIS 7494, at *11 (S.D. Fla. Apr. 5, 1994).  In addition, participation in corporate affairs is probative of knowledge.  *FTC v. Affordable Media*, 179 F.3d 1228, 1235 (9th Cir. 1999); *Amy Travel*, 875 F.2d at 574.

Here, Chris Miano undoubtedly knows of the material misrepresentations and unlawful practices of A+ and Accelerated Accounting given his role as the general manager of A+ and Accelerated Accounting and his active, day-to-day control and operation of those entities.  (*See supra* Section II.A.2.)  Likewise, given that Dana Miano is the sole corporate officer and owner of A+ (*see id.*), she knows of the material misrepresentations of A+ or, at a minimum, was recklessly indifferent or intentionally avoided learning the truth about the deceptive acts and practices of A+.   Under these circumstances, Dana and Chris Miano have actual or constructive of A+'s and Accelerated Accounting's misrepresentations, making them both subject to monetary liability stemming from the conduct of those corporate entities and making a freeze of their personal assets appropriate.  *World Travel*, 861 F.2d 1020 at 1031; *see also Gem Merch.*, 87 F.3d at 470 (upholding use of individual defendants' assets for restitution); *Amy Travel*, 875 F.2d at 574.

3.    **The TRO Should Appoint a Temporary Receiver for the Corporate Defendants.**

The Court should also appoint a temporary receiver pursuant to the Court's equitable powers under Section 13(b) of the FTC Act. *U.S. Oil & Gas*, 748 F.2d at 1432. Appointment of a temporary receiver is appropriate where, as here, there is "imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate." *Leone Indus. v. Assoc. Packaging, Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992); *see id.* When a corporate defendant has used deception to obtain money from consumers, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste" to the detriment of victims. *First Fin. Group of Tex.*, 645 F.2d at 438; *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963); *see also U.S. Oil & Gas Corp.*, 748 F.2d at 1432 (affirming preliminary injunction that appointed receiver).

Appointment of a receiver is particularly appropriate here because Defendants' deceptive acts and practices – including the fact that Defendants have continued their unlawful activities despite being subject to two prior state law enforcement actions (PX 3-4; PX 3-5) – demonstrate such an indifference to the law that Defendants are likely to frustrate the FTC's law enforcement efforts by destroying evidence and/or dissipating assets. The receiver will help prevent Defendants from disposing of ill-gotten funds by identifying, securing, and controlling the use of Defendants' assets, as well as marshaling and preserving their records. The receiver will also assist in determining the full extent of the fraud and identifying additional victims of Defendants' scheme. For these reasons, the Court should appoint a temporary receiver over Defendants A+ and Accelerated Accounting.

4.   **The TRO Should Grant Expedited Discovery and Immediate Access to Defendants' Business Premises.**

In order to locate assets wrongfully obtained from defrauded consumers, the TRO should authorize the FTC to engage in expedited discovery and allow the FTC and the temporary receiver immediate access to Defendants' business premises and records.  This relief is critical to the FTC's, the receiver's, and the Court's ability to understand fully:  (A) the scope of Defendants' business operations, their financial status, the participants involved, and their roles in the scheme; (B) the full range and extent of Defendants' law violations; (C) the identities of injured consumers; (D) the total amount of consumer injury; and (E) the nature, extent, and location of Defendants' assets.  Moreover, immediate access and limited expedited discovery are also necessary to protect against evidence destruction.  District courts have broad and flexible authority in equity to depart from routine discovery procedures and applicable time frames, particularly in cases involving the public interest.  *See* Fed. R. Civ. P. 26(d), 33(a), 34(b); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).  Accordingly, the Court should enter a temporary restraining order granting the FTC and the receiver immediate access and authorizing limited expedited discovery.

5.   **The TRO Should be Issued *Ex Parte*.**

The substantial risk of asset dissipation and document destruction in this case, coupled with Defendants' ongoing and deliberate statutory violations, justifies *ex parte* relief without notice.  Federal Rule of Civil Procedure 65(b) permits this Court to enter ex parte orders upon a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given.  *Ex parte* orders are proper in cases where "notice to the defendant would render fruitless the further prosecution of the action."  *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974); *In re*

35

*Vuitton et Fils, S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979). In cases involving pervasive fraud, "it [is] proper to enter the TRO without notice, for giving notice itself may defeat the very purpose for the TRO." *Cenergy Corp. v. Bryson Oil & Gas P.L.C.*, 657 F. Supp. 867, 870 (D. Nev. 1987). Mindful of this problem, this Court has regularly granted the FTC's request for *ex parte* TROs in Section 13(b) consumer fraud cases to preserve the possibility of full and effective final relief. *See supra* note 8.

As discussed above, Defendants' business operations are permeated by, and reliant upon, unlawful practices. (*See supra* Section III.B.1) The FTC's past experience has shown that defendants engaged in fraudulent schemes often dissipate assets and destroy records if they receive notice of an impending FTC enforcement action. (Bandy Certification, ¶¶ 18 - 20.) Such a risk is particularly high here given that Dana and Chris Miano already appear to have a long history of withdrawing large sums from Defendants' corporate bank accounts for their own personal use (PX 2-2, ¶¶ 10 - 16) and the nature of Defendants' scheme is permeated by fraud. Under these circumstances, there is a strong likelihood that Defendants would conceal or dissipate assets absent *ex parte* relief. As such, it is in the interest of justice to provide the requested *ex parte* relief to prevent the dissipation of assets or the destruction of evidence, which in turn will maintain the status quo and preserve this Court's ability to award full and effective final relief.

## IV.   <u>CONCLUSION</u>

For the above stated reasons, the FTC respectfully requests that the Court grant its Motion and issue a temporary restraining order that enjoins Defendants from continuing their illegal practices, imposes an asset freeze on all Defendants, appoints a temporary receiver for the corporate Defendants, grants the FTC and the receiver immediate access to Defendants' business

premises and records, authorizes limited expedited discovery, and orders Defendants to show

cause why a preliminary injunction should not issue.   Such *ex parte* emergency injunctive relief

is necessary to protect consumers from further harm and to help ensure the possibility of

effective final relief for the victims of Defendants' unlawful telemarketing scheme.

Respectfully submitted,

WILLARD K. TOM
General Counsel

Dated:  October 23, 2012

Bikram Bandy
Tel:  (202) 326-2978
E-mail:  bbandy@ftc.gov

William T. Maxson
Tel:  (202) 326-2635
E-mail:  wmaxson@ftc.gov

Federal Trade Commission
600 Pennsylvania Ave., NW, Mail Stop H-286
Washington, DC 20580
Fax:  (202) 326-3395

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION