# Plaintiff's Exhibit

# PX 1-10

## DECLARATION OF ANGELA MULLINS
## PURSUANT TO 28 U.S.C. § 1746

I, Angela Mullins, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

1.  I am a United States citizen over 18 years of age and live in Hanover, Massachusetts.

2.  Sometime in March 2012, I received a call on my home telephone line from a man who said his name was Terry Lawson. Terry told me his company name was A+ Financial Centers. Terry told me that I could call him back at (877) 748-2626, extension 229.

3.  At the time of the call, I had never done any business with A+, nor had I given A+ permission to call me.

4.  At the time of the call, my home telephone number was registered on the National Do Not Call Registry.

5.  Terry told me that he could help me financially by lowering the interest rates on my credit cards to between 3% and 6%. Terry told me that, with the lower interest rates he could obtain for me, I could save approximately $1,200 per year in interest charges. Terry also said that using his company's services to lower my interest rates would improve my credit.

6.  Terry asked me questions about each of my credit cards, including the name of the bank that issued the card, how much I owed on the card, the interest rate, the credit limits on the card, the credit card number, and the expiration date. I provided him with this information because I believed his claim that he could lower my interest rates.

7.  Terry said that, in order for A+ to lower my interest rates, I would have to pay A+ a one-time fee of $495. Terry told me that the amount that I would save with the lowered interest rates A+ was going to obtain for me would more than easily cover the $495 fee.

**PX 1-10**

Page 1

8.  Terry then placed me on hold for a few minutes.  When he came back on the line, he congratulated me because I had qualified for the program.  He then told me that he was going to transfer me to a colleague who was going to do a verification and get me started with lowering my credit card interest rates.

9.  Terry then transferred me to a woman named Amy.  Amy also told me that A+ would be able to lower my credit card interest rates to between 3% and 6%.  Amy told me that A+ would be sending me a package of materials that would explain the program and would contain forms that I needed to fill out in order to get started with lowering my credit card interest rates.  Amy asked me to verify my name, address, and credit card information.  Amy asked for my approval to charge my credit card the $495 fee.

10.  In response, I told her that I did not want her to charge my credit cards until I had received the package of information from A+ explaining the program in more detail.  I also told Amy that she could not charge one of my credit cards – my Bank of America card – because Bank of America had restricted me from making any additional charges to that card.

11.  Amy asked me for approval to charge my Citizens Bank credit card once I received the materials.  I gave her approval because I believed A+ could lower my interest rates and that I would not be charged until I reviewed the written materials they were sending me and gave A+ my signed written authorization to proceed with the program.  After the approval, Amy gave me a confirmation number of AFC18685.

12.  Neither Terry nor Amy mentioned anything to me about A+'s refund or cancellation policies.

**PX 1-10**

13.   A+ sent me the package of materials on March 30, 2012, which I received via priority mail on April 1, 2012.  The package had a return address of A+ Financial Centers, 10258 S. US Highway 1, Port St. Lucie, FL 34952.

14.   The day after I received the package, someone from A+'s office called me to confirm that I had received the materials.  The A+ employee who called me did not mention anything to me that my credit card was being charged.

15.   When I received my Citizens Bank credit card statement a few days later, I was shocked to see that I had been charged $495 by "Accelerated Financial" on March 30, 2012, despite the fact that I told Amy that I did not want to be charged until I had returned the papers and formally agreed to be part of the program.

16.   I immediately called A+ to complain about the fact that I had been charged without my consent.  A+ claimed that I did authorize the charge, but I insisted I had not.  After several minutes of arguing with them and threatening to report them to the Attorney General's office, A+ finally agreed to issue me a refund if I wrote "VOID" across the front page of the package and mailed it back to them.  I did as they instructed and returned the package to A+ on April 17, 2012.  A+ eventually issued a refund to my Citizens Bank credit card on April 24, 2012.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on 7/24/12 , 2012, at Hanover, Massachusetts.

*Angela Mullins*

Angela Mullins

**PX 1-10**

# Plaintiff's Exhibit

# PX 1-11

## DECLARATION OF TONY MULLINS
### PURSUANT TO 28 U.S.C. § 1746

I, Tony Mullins, hereby state that I have personal knowledge of the facts set forth below.  If called as a witness, I could and would testify as follows:

1.      I am a United States citizen over 18 years of age and live in Bellville, Ohio.

2.      On August 14, 2012, I received a call on my home telephone line.

3.      At the time of the call, my home telephone number was registered on the National Do Not Call Registry.

4.      When I picked up the phone, I heard a recorded message of a female voice telling me to press 1 on my telephone if I wanted to decrease my credit card interest rates.  I pressed 1 in response to the message.

5.      After I pressed 1 on my telephone keypad, I was connected to a male caller who said his name was Mark Morales, who said he was with "Card Services".  At some point during the call, Mark told me that I could contact him at (877) 748-2626, extension 293.

6.      Mark asked me a series of questions about my credit card debt, including how many credit cards I had, what balances I had on the cards, and what interest rates I was currently paying.  I provided Mark with the information he requested.

7.      Mark then asked me to give him the credit card number and expiration date for one of my credit cards, as well as my mailing address.  Mark told me that he needed this information to determine whether I qualified for the credit card interest rate reduction program.  I provided Mark with the information for my Sears Citibank credit card.

8.      After I gave Mark my credit card number, he placed me on hold.  When he came back on the line, he congratulated me because I had qualified for the program.

**PX 1-11**

Page 1

9.   Mark then transferred me to one of his colleagues, who told me his name was Micheal Singh.

10.   Micheal told me that his company could reduce the interest rates on all of my credit cards.

11.   Micheal told me that he could lower the interest rate on my Sears credit card to 0% and the interest rates on my remaining credit cards to between 3% and 6%.

12.   Micheal guaranteed that I would save at least $1,200 in one year with the lowered interest rates his company would obtain for me.

13.   Micheal said that I would have to pay a one-time fee of $495 in order to obtain these lowered interest rates.  Micheal said, however, that there would be no out-of-pocket expense to me because the $495 fee would be charged to my credit card.

14.   Micheal said that if his company was not able to save me at least $1,200 in one year through lowered credit card interest rates, he would refund the $495 fee to my credit card. Micheal said that he was making a money-back guarantee that his company would be able to show me at least $1,200 in savings in one year.

15.   Micheal told me that his company had helped many other people obtain lowered interest rates and that his company had many satisfied customers.

16.   Micheal told me that his phone number was (800) 320-0889, extension 229.

17.   I asked Micheal who his supervisor was.   Micheal told me his name was Mr. Nelson, who was the general manager.  Micheal told me that Mr. Nelson could be reached at extension 204.

18.   Micheal told me that he was going to transfer me to his colleague who was going to do a verification.  Micheal then transferred me to a man who said his name was Shawn.

**PX 1-11**

19.     Shawn told me that he was going to do a verification and that this portion of the call was going to be recorded.

20.     Shawn repeated many of the things that Micheal had told me, including the money-back guarantee that I would save at least $1,200 in one year through lowered interest rates. He also told me that his company would lower the interest rate on my Sears credit card to 0% and the interest rates on all my other cards to between 3% and 6%.

21.     I asked Shawn what the name of his company was. He told me that his company was called "A+ Financial Center".

22.     I asked Shawn how A+ was going to obtain the lowered interest rates for me. Shawn told me that A+ would assign me a financial counselor, who would contact my credit card companies and ask them to reduce my interest rates. Shawn told me that I would be on the line when the financial counselor made these calls.

23.     Shawn told me that A+ would be sending me paperwork that would describe the program, would detail everything that was discussed, and would include a form that would ask me to list all of my credit card numbers and balances. Shawn told me that I would have to fill out the form and return it to A+ in order to get started with my credit card interest rate reductions.

24.     Shawn told me that A+ would charge my Sears credit card the one-time $495 fee after I had received the paperwork, completed the forms, and sent them back to the company. Shawn then asked for my permission to charge my Sears credit card the $495 fee once I had returned the completed forms.

# PX 1-11

25.   Because I believed Micheal's and Shawn's guarantees that A+ would lower my interest rates and save me at least $1,200 in one year, I gave Shawn approval to charge my Sears credit card $495 after I received and returned the completed forms to the company.

26.   After I gave my approval, Shawn gave me a confirmation number of AFC22309.  The call then ended.

27.   At the time I gave my approval, I had approximately $700 of available credit on my Sears credit card.

28.   Immediately after the call, I was uncomfortable about having given out my information to the people at A+.  A day or so after the call, I did some online research about the company and saw that the company had many complaints.

29.   A day or two after the call, I looked up my Sears credit card statement on my computer and was stunned to see that A+ had already charged my credit card the $495 fee on August 14, 2012, despite the fact that Shawn specifically told me that I would not be charged until I returned the completed forms to A+.  The charge appeared on my credit card statements as "Accelerated Financial 877-7482626 FL".

30.   As soon as I saw that my card has been charged, I attempted to call Micheal Singh at the number he provided me.  I was unable to get a hold of him, but I did speak with a receptionist at the company.  I told the receptionist that I wanted to cancel and that I wanted Micheal Singh to call me back as soon as possible.  The receptionist told me that Micheal would return my call in 48 to 72 hours.

31.   I called back 2 hours later and spoke with the receptionist again.  I told her that I could not wait 48 to 72 hours and that I needed to speak to someone to cancel my participation in the program immediately otherwise I was going to file a complaint with the Federal

**PX 1-11**

Trade Commission and the Better Business Bureau. The receptionist took my message and told me that someone would call me back that day.

32. Approximately 3 hours later, I received a call from someone who said his name was Todd Nelson. Todd told me that he was the general manager of A+. Todd tried to talk me out of canceling. I told him that I wanted to cancel because I thought A+ was engaged in fraudulent activities based on the many complaints filed against A+ that I saw on the internet, the fact that A+ charged my credit card even though Shawn told me that I would not be charged until I returned the completed forms, and the fact that I was initially contacted by a robocall. I demanded an immediate refund and told him that if I did not get one, I was going to report A+ to the Federal Trade Commission and the Better Business Bureau. Eventually, Todd agreed to give me a refund.

33. A day or so after my phone call with Todd, I received a package from A+ that contained a service agreement and forms requesting financial information from me. I did not complete or return the forms to A+.

34. A+ refunded my $495 fee on August 16, 2012 by crediting my Sears credit card the $495 A+ had initially charged me.

35. Prior to the call I received from A+ on August 14, 2012, I had never done any business with A+, nor had I ever given the company permission to contact me.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on **Oct. 10**, 2012, at Bellville, Ohio.

Tony Mullins

**PX 1-11**

# Plaintiff's Exhibit

# PX 1-12

## DECLARATION OF PAMELA PARROTT
## PURSUANT TO 28 U.S.C. § 1746

I, Pamela Parrott, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

1.      I am a United States citizen over 18 years of age and live in Stockton, California.

2.      On August 4, 2012, I received a call on my home telephone line that appeared on my caller ID as "FINANCIAL CTR 360-474-3986".

3.      At the time of the call, my home telephone number was registered on the National Do Not Call Registry.

4.      When I picked up the phone, a male caller started speaking to me. He said that he was calling from "Financial Center". I thought the caller was calling from my bank, which is called the Financial Center Credit Union.

5.      The caller told me that he obtained my credit information from one of the major credit reporting companies. Although I am not certain, I believe he told me that he had obtained my information from Equifax.

6.      The caller told me that he was calling because he could lower the interest rates on my credit cards. I told him that I did not need the service because I did not have much credit card debt. The caller was very insistent that I could save money using his program.

7.      The caller asked me a lot of questions about my credit card debt, including how much I owed on each of my credit cards and my current interest rates. I told him that I only owed approximately $8,000 on my credit cards, of which approximately $6,000 was on my Lowes credit card that I had recently used to purchase some new appliances for my kitchen. I told the caller that I would have no trouble paying off my entire $8,000 credit card debt in a month or two.

# PX 1-12

8.      Despite this information, the caller said that if I qualified for the program, his company would contact my credit card companies and negotiate lower interest rates for me. The caller told me that he could lower my credit card interest rates to 0% or 3%. He guaranteed that he could get me these lower interest rates and that those interest rates would be permanent. The caller told me that I would save $1,500 in interest in one year and get out of debt at least three times faster with the lowered credit card interest rates he could obtain for me. The caller also said that using his company's program would improve my credit rating because I would be able to pay off my credit card debt faster.

9.      The caller initially told me that I would have to pay a one-time fee of $995 to use his company's services. Later, however, he told me that the fee would be $595. The caller told me that I would not incur any out-of-pocket expense to use his company's credit card interest rate reduction services because the amount I would save with the lowered interest rates his company would get me would easily exceed his company's fee.

10.    At some point during the call, the caller said that he could not lower the interest rate on my Lowes credit card because that credit card was issued not issued by a bank.

11.    The caller said that, in order to qualify for the program, I needed to have at least $9,000 in debt on my credit cards. I again told him that I only had approximately $8,000 in total credit card debt, of which approximately $6,000 was on my Lowes credit card. The caller nonetheless asked me to provide information about my credit cards, including the credit card number, the code on the back of the card, the expiration date, and the last 4 digits of my social security number. The caller said he needed this information to determine whether I qualified for the interest rate reduction program. Eventually, I

Page 2

**PX 1-12**

succumbed to the caller's repeated requests and provided the information he requested for my Discover credit card.

12.     After I provided the information requested by the caller, he placed me on hold for several minutes.  When he came back on the line, he congratulated me because I had qualified for his company's interest rate reduction program.  The caller then transferred me to a person who he said was his supervisor.

13.     I was then transferred by the original caller to a man who said his name was Paul Bennett.  Paul Bennett also told me that I had qualified for the program and that his company would reduce my credit card interest rates.  Paul told me that the name of his company was A+ Financial Centers.  I thought this was odd because the initial caller did not give that company name.  Paul told me that I could contact him at (800) 320-0889, extension 230.

14.     Paul then said he had to transfer me to another person who would do a verification.  He then transferred me to a man who said his name was Shawn.

15.     Shawn got on the phone and told me that this portion of the call was being recorded.  Shawn asked me to verify my name, address, and credit card information.  Shawn then gave me a confirmation number of AFC22027.  Shawn also told me that the name of his company was A+ Financial Centers.  Shawn told me that I would be receiving a package in a few days from A+ that had some information about the program and forms that I would need to fill out and send back to A+ in order to get started on my credit card interest rate reductions.  After this, the call ended.

16.     I do not recall Shawn, Paul, or the initial caller requesting my permission to charge my Discover credit card at any time during the call.  Based on everything that the three of

**PX 1-12**

them told me, I believed that I would not be charged the $595 fee until A+ had actually delivered on their guarantee to permanently lower my credit card interest rates to 3% or 0%.

17. Neither Paul, Shawn, nor the initial caller told me anything about a refund or cancellation policy at any point during the call.

18. After the call ended, I immediately felt uncomfortable about the fact that I had given my credit card information to A+ because of what I felt were high-pressured sales tactics used by the initial caller, Paul, and Shawn. As a result, a few hours after the call, I called A+ back at the number that Paul had provided me to cancel my participation in the program. I was unable to get a live person on the phone, so I left several voicemail messages with A+ stating my name, telephone number, and my request to cancel my participation in the program. I left all of these messages on the same day I received the initial call.

19. After I left my voicemails, I did some online research about A+. I saw numerous complaints about the company and saw that numerous people had said that the company's credit card interest rate reduction program was a scam. When I saw this information, I became very concerned because I knew that A+ had my name, address, phone number, credit card information, and the last 4 digits of my social security number.

20. Through my online research, I also found A+'s website – www.aplusfinancialcenters.com. From that website, I got an e-mail address for the company – service@aplusfinanialcenters.com. I sent multiple e-mails on August 5, 2012, to that e-mail address demanding a refund. In the e-mails, I indicated that if I did not get a refund, I was going to contact my lawyer.

**PX 1-12**

21.   I next contacted Discover to determine whether A+ had charged anything to my credit card. I was shocked to learn that A+ had charged my Discover card $595. The charge appears on my credit card statement as "ACCELERATED FINANCIAL CE 877-7482626 FL".

22.   I immediately disputed the charge with Discover. As of this date, Discover has issued me a temporary refund pending its investigation of A+'s charge. I also requested that Discover cancel my credit card and issue me a new one, which Discover has done.

23.   On August 6, 2012, a man named Todd who said he was with A+ left a voicemail on my home telephone number asking me to call him back. I called A+ back later that day and reached a female receptionist at A+. I asked the receptionist to connect me to Todd. The receptionist placed me on hold for several minutes, after which she returned and said Todd was on another line, but he had received the cancellation request I e-mailed on August 5th and would call me back shortly.

24.   On August 9, 2012, I received a package of materials from A+. The package contained a "Service Agreement" and a series of forms that asked me to list all of my credit card numbers and provide other financial information about myself. I did not complete the forms.

25.   On the day I received the package, Todd from A+ called me again. Todd told me that his full name was Todd Nelson. Todd said he was the general manager of A+. In a firm voice, Todd told me that he had received my e-mails and voicemails requesting a refund. He asked why I wanted a refund. I told him that I was misled. Todd demanded to know what I thought was a lie. I told him that what little debt I had would be paid off shortly and that I felt pressured to sign up for a program that I did not need. After several

**PX 1-12**

minutes of back and forth, Todd eventually agreed to give me a refund.  Todd told me to write "void" across the service agreement A+ sent me and return it to A+ and that I would be issued a refund within 7 to 14 business days.  I did as he requested.

26.   Discover subsequently has informed me that A+'s $595 charge had been dropped.  As of the date of this declaration, however, A+'s $595 charge still appears on my Discover credit card statement.

27.   Prior to the call I received from A+ on August 4, 2012, I had never done any business with A+, nor had I ever given the company permission to contact me.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on _Aug. 21_, 2012, at Stockton, California.

_Pamela Parrott_

Pamela Parrott

**PX 1-12**

# Plaintiff's Exhibit

# PX 1-13

## DECLARATION OF DONNA ROBBINS
## PURSUANT TO 28 U.S.C. § 1746

I, Donna Robbins, hereby state that I have personal knowledge of the facts set forth below.  If called as a witness, I could and would testify as follows:

1.   I am a United States citizen over 18 years of age and live in Blaine, WA.

2.   In 2011, my husband and I began receiving daily frequent pre-recorded calls about lowering my interest rate.

3.   Our telephone number was registered on the National Do-Not-Call Registry when we started receiving said pre-recorded calls.

4.   One time, I picked up the phone and pressed one to speak with a representative.

5.   The representative told me that he worked for A+ Financial.

6.   The representative told me that A+ Financial worked with the major credit card companies to lower consumers' credit card interest rates.

7.   The representative asked me for information about my credit cards.

8.   I provided the representative the account numbers and balances for my Citi Bank credit card and my Chase credit card.

9.   The representative told me that A+ Financial could reduce the interest rate on my Citi Bank card from the 16% I was currently paying down to 0%.  The representative told me that this interest rate would be locked in for at least 2 years.

10.   The representative told me that A+ Financial could reduce the interest rate on my Chase card down to 2-3%.

11.   The representative told me that the cost for said service was $895.

12.   The representative provided me with a call-back number, (877) 748-2626.

13.   Based on the claims that the representative made, I told the representative that it sounded like something we needed, but that I needed to talk with my husband first.

Page 1

# PX 1-13

14.    I talked with my husband after I spoke with the representative. My husband told me that it sounded like a scam. We looked up A+ Financial with the Better Business Bureau and found more than 30 complaints.

15.    I called back A+ Financial and spoke with same representative I spoke with during the first call. I asked the representative about the more than 30 Better Business Bureau complaints against A+ Financial. The representative assured me that A+ Financial served more than 90,000 customers and that the vast majority were satisfied with his company's services. He told me that 30 complaints out of 90,000 customers were insignificant.

16.    The representative told me that they would immediately reduce my Citi Bank interest rate. He told me again that A+ Financial would guarantee a 0% interest rate for at least 2 years.

17.    The representative told me that A+ Financial would send me a Welcome Packet with a contract to sign.

18.    I told the representative that we would sign the contract once A+ Financial reduced our Citi Card interest rate to 0%. He agreed.

19.    Unbeknownst to me, A+ Financial had charged my credit card $895 immediately, the same ~~I became aware of it soon after.~~ day I spoke to representative and before I received my Welcome Packet and contract.

20.    A+ Financial never reduced any of my credit card interest rates.

21.    My husband and I realized we had been scammed. My husband filed a complaint with the Washington Attorney General's Office.

22.    Shortly after my husband filed the complaint, a representative from A+ Financial contacted us. The representative offered to provide us a refund if we wrote A+ Financial a letter.

23.    We wrote a letter and mailed said letter to A+ Financial. A copy of the letter is attached hereto as **Attachment A**. We received a refund.

Page 2

**PX 1-13**

24.     When A+ Financial first contacted my husband and me, we did not have an existing business

relationship with A+ Financial nor had we ever given A+ Financial permission to contact us.


I state under penalty of perjury that the foregoing statement is true and correct.

Executed on _July 24_ , 2012, at Blaine, WA.

Donna Robbins

**PX 1-13**

Page 3

September 29, 2011

**Mr. Todd Nelson**
**General Manager**
**A+ Financial Center, LLC**

**Re: Proposal to Withdrawal Complaint #394498 Filed With Washington State**
**Attorney General.**

Mr. Nelson:

To date, A+ Financial Center LLC, Port Saint Lucie FL has not committed any fraud against my wife Donna Robbins and I.  We, in return have not signed or agreed to sign any contract to proceed with any business transactions with your company and no not wish to proceed further.

Per your telephone conversation and proposed refund agreement with my wife, Donna, this afternoon, I will agree to withdrawal all agency filings against A+ Financial Services, LLC in return for a total refund of the $895.00 which A+ Financial has charged against my wife's Citi Bank credit card.  This letter includes an offer to withdrawal of the claim (# 394498) filed with the Washington Attorney General's Office and the claim against your company filed with the BBB, Bellingham WA, Case Number: 90117248.

I will write a letter, mail and fax it to these agencies to withdrawal these two complaints within three business days of notification from Citi Bank of a refund for $895.00 to Donna K. Robbins' credit card account.  Please notify us with a transaction number when this refund has been processed by Citi Bank and I will proceed as promised in this letter.

Sincerely,

Charles D. Robbins III

**PX 1-13**                                          **Attachment A**

# Plaintiff's Exhibit

# PX 1-14

## DECLARATION OF MAUREEN SMITH
### PURSUANT TO 28 U.S.C. § 1746

I, Maureen Smith, hereby state that I have personal knowledge of the facts set forth below.  If called as a witness, I could and would testify as follows:

1.      I am a United States citizen over 18 years of age and live in Colton, California.

2.      On or about February 20, 2012, I received a call on my home telephone from a male caller who told me his name was Terry Lawson.  At the time of the call, my home telephone number was registered on the National Do Not Call Registry.

3.      When Terry first called me, he gave me a company name, but I do not remember the exact name that he gave me.  Later in the call, however, Terry told me that his company's name was A+ Financial Centers, which was a different company name than what he gave me at the beginning of the call.  Terry also told me that I could reach him by calling (877) 748-2626, extension 229.

4.      Terry said that he could help me lower the interest rates on my credit cards.  He then asked me a series of questions regarding my credit card debt, including how many credit cards I had, which bank issued the card, how much I owed on each card, whether I was behind on payments, and the current interest I was paying on each card.  I answered Terry's questions.

5.      Terry told me that he could reduce the interest rate on my American Express card to between 3% and 5%, the interest rate on my Chase Visa card to between 3% and 6%, and the interest rates on my Home Depot/Citibank card and my Sears card to 0% to 3%. Terry guaranteed me these interest rate reductions and guaranteed that I would save at least $4,000 in interest within one year.

6.      Terry told me that A+ had successfully negotiated significantly lower credit card interest rates for lots of other satisfied customers.

# PX 1-14

7.    Terry told me that if I used A+'s services, my credit rating would improve because I would be able to pay off my debts faster.

8.    Terry told me that if I used A+'s services, I would save approximately 1/3 of the balance I owed on each of my cards due to the lowered interest rates that A+ would get for me.

9.    Terry said that, in order for A+ to reduce my interest rates, I had to pay A+ a one time charge of $895. Terry explained, however, that the amount I would save with the lowered interest rates A+ would get for me would easily cover the $895 fee.

10.    I explained to Terry that I did not have enough available credit to cover the $895 fee, since I only had $500 of available credit. Terry told me that was not a problem because I could pay $495 of the fee initially and the remaining $400 at a later time when I had more available credit, which I would quickly obtain with the lowered interest rates A+ would get for me.

11.    I told Terry that I was interested in the program but that I did not want to pay or commit to anything until I received more information about the program in writing.

12.    Terry told me that he would be sending me a package of information and that I needed to fill out the forms and send them back to him so that his company could start working with my credit card companies to lower my interest rates. I provided him with my mailing address. Terry gave me a confirmation number of AFC17823. The call then ended.

13.    A few days later, I received a package of documents from A+ Financial Centers. In the package, A+ guaranteed that it would save me "at least $4,000 in interest and finance charges within the first year or the initial cost of the program will be 100% refunded." The package also stated, however, that "A+ Financial Centers does not make any warranty as the results of this program or the use of its services." The package also included a form that asked me to provide information regarding all of my credit cards,

**PX 1-14**

including my credit card numbers, amount owed, interest rates, credit limit, and monthly payment. I completed the forms and sent them back to A+ on February 29, 2012. A true and correct copy of the documents I sent back to A+ (with my credit card numbers redacted) is attached as Exhibit A.

14. A few days after I returned the forms, I received a call from a man who said he was with A+ and had received my forms. This second caller was not Terry Lawson, but another person who worked at A+. I do not remember the second caller's name.

15. The second caller informed me that I did not have enough available credit on my American Express card to cover the $895 fee. He told me that I only had enough available credit to cover $495 of the total fee amount, so he explained that A+'s total fee would have to be split up into two payments – an initial payment of $495 and a second payment of $400.

16. The second caller told me that he was going to take steps to consolidate my debts. I told him I did not want to do that and that Terry had told me that he was going to reduce my credit card interest rates to between 0% and 6%. The second caller said that Terry had given me incorrect information. I then told the second caller that I was no longer interested in A+'s services. We then got into a heated discussion and eventually the second caller hung up on me. At no time during my conversation with the second caller did he disclose that A+ had already charged my credit card.

17. A few days later, I checked my American Express account online and was shocked to see that A+ had charged my credit card $495. I assume that A+ got my credit card information from the forms that I filled out and sent back to them.

18. Although A+ charged me $495, A+ had not done anything to reduce my credit card interest rates or even consolidate my credit card debt. A+ did absolutely nothing to justify the $495 charge.

**PX 1-14**

19.     I was extremely upset when I found out I had been charged, despite the fact that I told the second caller that I was not interested in A+'s services.  I tried calling A+ to request a refund, but could not get in contact with either Terry or the other person I had previously spoken to.

20.     After I could not get in contact with people from A+, I filed an online complaint about the company on www.econsumer.gov.  I also wrote A+ a letter demanding a refund.  In that letter, I informed A+ that I had filed a complaint against them.

21.     Approximately 3 weeks after I sent my letter, I received a letter back from A+ in which they stated that they were going to give me a refund.  I eventually saw that they credited my American Express card for the $495 that they initially charged.

22.     At no time during any of my calls with A+ did anyone I spoke to at A+ mention anything about a cancellation or refund policy.

23.     Prior to the February 20, 2012 telephone call I received from A+, I had never done any prior business with A+ Financial Centers nor had I ever given the company permission to contact me.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on  7/23 , 2012, at Colton, California.

Maureen Smith

**PX 1-14**                                                    Page 4

# EXHIBIT A

Jul 20 12 10:11a          Maureen Smith                                        p.2



10258 S. US Hwy 1
Port Saint Lucie, FL 34952
Toll Free: 877-748-2626
Fax: 772-336-8437
save@aplusfinancialcenters.com

Dear: Maureen Smith

Congratulations for taking the first step toward becoming debt free. In this fast paced and often chaotic day and age taking a moment to review our financial situations can seem impossible. But you have made the decision to join the thousands of other A+ Financial Center customers in saving both time and money. Follow these simple instructions and get started saving money today.

1. The Elite Membership and Debt Profile is the most essential document in your entire portfolio, the information you provide for us will determine your total savings. If you're having a hard time verifying your balances and interest rates you can always call the phone numbers on the back of your credit cards, or for your loans call the number provided on your statement. Itemize your debts as thoroughly as you can. When deciding what your payment is you can use your check register to see what you paid toward the accounts last month. If you need additional space a second page is provided.

2. Next fill out the Client Questionnaire. This information is confidential and shared only with your financial advisor. It lets them understand more about your personal financial situation, your goals, and what your concerns are.

3. Once your Debt Profile has been filled out and signed, please send it to us without delay in the envelope provided, by fax, or via email along with the Client Questionnaire. The sooner we receive these documents the sooner your savings will start.

A+ Financial Centers has paved the road to financial freedom. Please keep important documents, your notes, guides, and your personal debt elimination schedule that you will receive from us (Please fill out and sign the Elite Membership and Debt Profile and send it back as soon as possible to expedite this process). Utilize these items to their full potential. You are not alone in this venture; A+ Financial Centers has professional advisors to assist in any way they can, to answer any and all of your financial questions; and concerns now and in the future. Do not hesitate to call 877-748-2626 in the US or Canada.

**PX 1-14**

Jul 20 12 10:11a        Maureen Smith                                                    p.3



**10258 S. US Hwy 1**
**Port Saint Lucie, FL 34952**
**Toll Free: 877-748-2626**
**Fax: 772-336-8437**
**save@aplusfinancialcenters.com**

## Service Agreement

The purpose of this Service Agreement is to outline the relationship between
the individual, and A+ Financial Centers.

**In this mutual service agreement, A+ Financial Centers agrees to provide you with any or all of the following services:**

1. Our service package, known as "Your Financial Management Partner for Success"
2. Our written evaluation and analysis of your current debt and credit profile, through your timely submission of the personal and financial profile forms.
3. Our financial road map to include customized credit card payment schedule, tailored to reduce the projection of your overall interest paid on debts.
4. We guarantee a minimum savings of at least $ 4,000 in interest and finance charges within the first year or the initial cost of the program will be 100% refunded.
5. Communicate and respond immediately to your inquires and submissions of personal financial information.
6. Honor your right to privacy, and protect your personal and financial information.
7. Accept your onetime payment of $ 895.00 for our full and only charge for this service. $ 495.00 of which to applied be now, and the additional $ 400.00 to be applied after we complete the work.
8. We do not negotiate principal balances or make settlement offers; we will attempt to negotiate on your behalf to reduce interest rates.

**As a valued client you have a responsibility and agree to:**

1. Accept and acknowledge this agreement by signing this service agreement.
2. Fully participate in the program.
3. Kindly return the package within thirty days from receiving it.
4. Understand and acknowledge that A+ Financial Centers does not make any warranty as the results of this program or the use of its services.

**Authorization to charge credit card:**

Name as it appears on card: **Maureen A. Smith**

Last Four of Credit Card Number: ▮▮▮▮

Expiration Date: ▮▮▮▮

Total amount to be charged to your credit card: $ 895.00

Signature: _Maureen A Smith_                    Date: _2/29/2012_

# PX 1-14

Jul 20 12 10:11a        Maureen Smith                        p.4



10258 S. US Hwy 1
Port Saint Lucie, FL 34952
Toll Free: 877-748-2626
Fax: 772-336-8437
save@aplusfinancialcenters.com

## *Elite Membership*

A+ Account Number: AFC17823

Client: **Maureen Smith**

█████████████

Colton, CA███████

As long as you make your payments on time and according to the schedule you will receive the benefits and significant savings accorded to you.  If for some reason, you cannot make a payment or you face a financial problem which necessitates putting more money on one of your cards, just call us and we will rework the numbers free of charge.  It does not matter if this happens once a year or five times in six months.  Whenever there is a change you can call us and we will reprint a payment schedule for you.  Again, free of charge.  That is how much we believe in this program and that is how much we want you to be satisfied with our service.  So, to get your savings started please fill out the debt profile below, sign and send it back in the envelope provided, by fax, or via email.

**Credit Card Debt:**

| Credit Card Bank Name | Credit Card Number | Interest Rate | Credit Limit | Balance | Payment |
|---|---|---|---|---|---|
| Chevron & Texaco Credit Card | ██████████ | 29.99% | ████████████████ | | |
| Discover | █████████ | 19.49 % Pu 23.99% Ca | | | |
| American Express | ███████████ | 15.24 % | | | |
| Chase Credit Card | █████████ | 26.24% | | | |
| Home Depot | ████████ | 26.99% | | | |
| Sears | █████████ | 26.99% | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## PX 1-14

Jul 20 12 10:12a        Maureen Smith                p.5



10258 S. US Hwy 1
Port Saint Lucie, FL 34952
Toll Free: 877-748-2626
Fax: 772-336-8437
save@aplusfinancialcenters.com

**Secured Debt:**

| Creditor | Account Number | Interest Rate | Term Left | Balance | Payment |
|----------|----------------|---------------|-----------|---------|---------|
|          |                |               |           |         |         |
|          |                |               |           |         |         |
|          |                |               |           |         |         |
|          |                |               |           |         |         |
|          |                |               |           |         |         |
|          |                |               |           |         |         |
|          |                |               |           |         |         |
|          |                |               |           |         |         |
|          |                |               |           |         |         |
|          |                |               |           |         |         |

**Guarantee and Knowledge of Receipt:**

We promise to show you how to save at least $ 4,000  per our Service Agreement.  Per your verbal request on voice imprint number AFC17823 your processing fee of $ 895.00 USD was applied to the card of your choice, according to the card issuer agreement.  As per our Service Agreement our Refund Policy states that if and only if A+ Financial Centers cannot meet the minimum savings guarantee of $ 4,000 in interest and finance charges the initial cost of the program will be 100% refunded.

Signature: _Maureen A. Smith_        Date: _2/29/2012_

# PX 1-14

Jul 20 12 10:12a     Maureen Smith                                          p.6



10258 S. US Hwy 1
Port Saint Lucie, FL 34952
Toll Free: 877-748-2626
Fax: 772-336-8437
save@aplusfinancialcenters.com

## *Client Questionnaire*

So that we may better understand your current financial situation and future goals please complete this questionnaire as completely and accurately as possible.

1. Which of your debts concerns you the most? *American Express*
2. Have you ever had a bankruptcy? ☐ Yes ☒ No
   a. If yes, when? _____
3. What is your current annual household income? $ ██████████
4. Do you own or rent your home? ☒ Own ☐ Rent
5. Do you pay more than the minimum payment on your credit card accounts? ☒ Yes ☐ No
   a. If yes which accounts and how much more?
      i. ████████████████
      ii. ████████████████
      iii. ████████████████
      iv. ████████████████
      v. ████████████████
      vi. ████████████████
      vii. ████████████████
      viii. _____
      ix. _____
      x. _____
      xi. _____
6. What do you use your cards for most? ☒ Convenience ☐ Emergencies ☐ Medical ☐ Other
   a. If other please explain: _____
7. What is the best time of the day to reach you?

   ☐ 8AM to 11AM ☐ 11AM to 1PM ☒ 1PM to 4PM ☐ 4PM to 8PM ☐ 8PM to 10PM

8. Are there any alternative phone numbers such as a cell phone or a work phone? *No.*
   a. Type: _____ Number: _____
   b. Type: _____ Number: _____
   c. Type: _____ Number: _____
   d. Type: _____ Number: _____

# PX 1-14

# Plaintiff's Exhibit

# PX 1-15

## DECLARATION OF ALLISON WILLINGHAM
### PURSUANT TO 28 U.S.C. § 1746

I, Allison Willingham, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

1.　　I am a United States citizen over 18 years of age and live in Germantown, Tennessee.

2.　　Sometime in March 2012, I received a phone call in the late afternoon on my home telephone.  At the time of the call, my home phone number was registered on the National Do Not Call Registry.

3.　　Although I am not 100% certain, when I answered the phone I heard a prerecorded message that indicated that if I wanted to reduce the interest rates on my credit cards, I should press 1 to speak to a live operator.  I pressed 1 on my telephone and was connected to a male caller.

4.　　The male caller initially gave me a generic company name that I believe was something like "Card Services".

5.　　The male caller asked me questions about my credit cards and my current interest rates.  I provided him with this information.  The male caller then promised that he could reduce the interest rates on my credit cards to a fraction of what they currently were.

6.　　The male caller then asked me to provide the card number, expiration date, and bank name for one of my credit cards so he could verify my eligibility for the program and qualify me.  I provided him with the requested information.  The male caller then placed me on hold for several minutes.

7.　　The male caller then came back on the line and told me that I was eligible for an interest rate reduction.  The male caller then transferred me to a female colleague who he said would assist me in getting my credit card rates reduced.

Page 1

**PX 1-15**

8.   The female caller said that I could save significant amounts per year by utilizing her company's services to lower my credit card interest rates.  She said that she could reduce my rates by over 50%.  She also told me that many other people had used her company's services and saved thousands of dollars due to lowered interest rates her company obtained.

9.   I asked the female caller how her company was going to make money by lowering my interest rates.  The female caller responded by telling me that, in order to get my interest rates reduced, I would have to pay her company a fee of $795, but she said that the fee would not be charged until her company had reduced my interest rates as promised.  She also told me that the reduced interest rates her company would obtain for me would quickly and easily cover the cost of her company's one-time service fee.

10.  I told the female caller that I wanted to discuss the matter with my husband and that I did not want to pay any fee or commit to anything until doing so.  The female caller told me that she understood.  She said that she was sending me paperwork to sign and assured me that nothing would be charged to my credit card until she received the signed paperwork back from me.  I asked her to confirm several times during the call that my card would not be charged until she received my signed paperwork back from me, and each time she confirmed that was correct.

11.  The female caller then did a verification where she asked me several questions and had me verify a variety of information.

12.  Neither the male caller nor the female caller told me anything about a refund or cancellation policy.

**PX 1-15**

13.     At some point during the call, either the male or female caller (or both) told me that the name of their company was "A+ Financial Centers".

14.     In my notes, I wrote down the following phone numbers for A+ Financial Centers – (888) 757-6500 and (772) 408-1340.  I believe, although I am not 100% certain, that one or both of the callers told me I could reach A+ Financial Centers by calling (772) 408-1340 and that the (888) 757-6500 phone number appeared on my caller ID when the call came in.  I am certain, however, that both of these phone numbers were associated with my call with A+ Financial Centers in some manner.

15.     Both the male caller and the female caller said they could reduce my credit card interest rates if I paid the $795 fee.  Neither the male caller nor the female caller said anything during the call that indicated that their company would be unable to obtain the significantly lowered credit card interest rates that they promised.

16.     After the call ended, I felt uncomfortable about the call and about the fact that I gave out my credit card information.  I discussed the matter with my husband when he came home from work, and he did on-line research into A+ Financial Centers and found numerous complaints about the company.  At this point, we immediately contacted my credit card company to alert them about what we believed was a potential fraudulent charge that was going to be charged to my credit card.

17.     When we contacted my credit card company, we were surprised to learn that, despite the female caller's repeated assurances that my credit card would not be charged until I sent back my signed paperwork, the company had, in fact, charged my credit card $795 on the very day of the phone call.  I challenged the charge, and the credit card company agreed to take it off my bill.

**PX 1-15**

18.   Prior to the March 2012 call I received from A+ Financial Centers, I had never done any

business with A+ Financial Centers, nor had I ever given the company any written

permission to contact me.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on July 19, 2012, at Germantown, Tennessee.

Allison Willingham

**PX 1-15**

# Plaintiff's Exhibit

# PX 1-16

## DECLARATION OF MARK ZIMMERMAN
### PURSUANT TO 28 U.S.C. § 1746

I, Mark Zimmerman, hereby state that I have personal knowledge of the facts set forth below.  If called as a witness, I could and would testify as follows:

1.     I am a United States citizen over 18 years of age and live in Camp Verde, Arizona.

2.     On May 19, 2012, around 9:00 A.M., I received a call from a female on my home telephone line.  At the time of the call, my home telephone number was registered on the National Do Not Call Registry.

3.     The female caller did not give me her name, but she said she was calling from "Card Member Services".  Because she said she was calling from "Card Member Services", I thought it was my credit card company calling me.

4.     Shortly after the call was connected, the female caller transferred me to a male caller who said his name was Michael Singh.  Michael said he was a senior account representative.  Michael said that he could lower my credit card interest rates to between 2% and 6%.

5.     Michael said that, in order to determine if I qualified for the interest rate reduction, he needed my credit card number, credit card expiration date, the name of the bank that issued the card, and the bank's toll-free phone number on the back of the card.  I provided Michael with this information.

6.     Michael then put me on hold for a few minutes.  When he came back on the line, he told me that my card did not qualify because it only had approximately $250 in available credit, and I needed $495 in available credit to cover his company's fee.

7.     Michael then asked if I had any other credit cards.  I said yes.  Michael asked me to give him the same information for my other credit card (card number, expiration date, bank name, and the bank's toll-free number on the back of the card).  I again provided the

# PX 1-16

information he asked for.  Michael then placed me on hold again.  When he came back on the line, Michael said I qualified for the program because I owed enough on my credit cards and had enough available credit on them to cover his company's $495 fee,.

8.  After I qualified, Michael told me that his company's name was A+ Financial Centers.  I thought this was suspicious because the initial caller said she was calling from Card Member Services.  I asked Michael whether his company was "on the up-and-up" because he now had my credit card information.  Michael told me not to worry because no one could do much with just my credit card number.  Michael explained that he would need to also have my PIN code, social security number, or other information in order to be able to charge anything to my card.

9.  Michael told me that, after paying the $495 fee, A+ would save me at least $1,200 in the first year or I else I would get my money back.  When I expressed concerns about the $495 fee, Michael explained that the savings I would get from the reduced interest rates A+ would negotiate for me would more than make up for the $495 fee.  Nonetheless, Michael said that I had to pay the $495 fee first before A+ would negotiate lower credit card interest rates for me.

10.  After I qualified, Michael transferred me to a colleague named Amy, whom he said would do a verification and get me started with my interest rate reduction.

11.  Once I was transferred to Amy, she told me that she was in the verifications department.  She also told me that the call was being recorded.

12.  Amy told me many of the same things that Michael had told me.  Amy told me that A+ could negotiate my credit card interest rates down to between 2 and 6 percent and that I would save at least $1,200 in one year, which would easily cover A+'s $495 fee.  Amy

**PX 1-16**

told me that with the reduced interest rates A+ would obtain for me, I would be able to get out of debt 3 to 5 times faster. Amy also told me that if A+ was unable to negotiate my interest rates down to between 2% and 6%, I would get my money back. Amy did not place any conditions, disclaimers, or qualifications on her company's ability to lower my credit card interest rates to between 2 and 6 percent. Amy also told me that using A+'s services would not affect my credit in any way.

13.     Amy then asked for my authorization to charge my two credit cards a total of $495 to cover A+ Financial's one-time service charge. She asked me to verify my credit card numbers, expiration dates, and my name and address. Amy said that after charging my card, A+ would send me a package of materials that I would have to fill out and send back to A+ to get started on getting my interest rates reduced.

14.     Based on the representations made by Amy and Michael, I confirmed my credit card information and gave Amy approval to charge my two credit cards a total of $495. My cards were charged that day. A+ charged me $200 on one of my credit cards and $295 on the other. Amy told me that the charges would appear on my credit cards as either "Accelerated Accounting" or "A+ Financial Centers", but the charges actually appeared on my credit card statements as "Associated Financial".

15.     After charging my card, Amy then provided me with a confirmation number of AFC19994. She told me that I would have to send back signed copies of the materials they were sending me within 30 days or else I would not be able to get a refund. Neither Amy nor Michael said anything else during the call about refunds or cancellation policies.

**PX 1-16**

Page 3

16.   On May 23, 2012, I received a package in the mail from A+.  A copy of the package I
        received is attached as Exhibit A.  In the package, A+ said that it could help me"[g]et out
        of debt three-to-five times faster" and "[s]ave thousands of dollars on your debt."  A+
        also stated in the package that it was a "fully Licensed and Bonded agency specializing in
        skillful debt reduction."  In the package, A+ guaranteed that it would save me "at least
        $1,200 in interest or finance charges within the first year or the initial cost of the program
        will be 100% refunded."  The package also stated, however, that "A+ Financial Centers
        does not make any warranty as the results of this program or the use of its services."

17.   The package contained a form that asked me to provide the information about each of my
        credit cards, including the name of the bank that issued the card, credit card number,
        interest rate, credit limit, balance, and monthly payment.

18.   On May 24, 2012, someone from A+ called me to confirm that I had received the
        package A+ sent.

19.   I felt uncomfortable about providing more credit card numbers to A+, so I did not return
        the forms they sent me.

20.   After I received the package from A+, my suspicions about the company continued to
        grow.  I contacted the Better Business Bureau on May 29, 2012, to find out more about
        the company.  The Better Business Bureau told me that it could not verify A+ as a
        legitimate business.  I also learned that it is illegal to charge in advance for debt relief
        services such as interest rate reduction.  Upon learning this information, I became
        convinced that I had been scammed by A+.

21.   I then immediately filed a complaint with the Federal Trade Commission on May 29,
        2012.  I also contacted my credit card company that same day and asked for a refund of

**PX 1-16**

the charges made by A+ because I believed they were fraudulent.  I also asked my credit card company to block any additional charges from A+.  My credit card company has issued a temporary refund on the charges pending their investigation.

22.  On May 29, 2012, I also called A+ back at the number that Michael Singh gave me (800-320-0889, ext. 2229) to request a refund.  My call was answered by an operator, who placed me on hold.  After being placed on hold for several minutes, I hung up.

23.  Prior to the May 19, 2012 call I received from Michael and Amy, I had never done any business with A+ Financial Centers, nor had I ever given the company any written permission to contact me.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on _Aug  2_____, 2012, at Camp Verde, AZ.

_Mark E Zimmerman_

Mark Zimmerman

**PX 1-16**