# Plaintiff's Exhibit

# PX 4-2

## DECLARATION OF LISA T. WILHELM
### PURSUANT TO 28 U.S.C. 1746

I, Lisa T. Wilhelm, hereby declare as follows:

QUALIFICATIONS AND EXPERIENCE

1.      My name is Lisa T. Wilhelm.  I am a United States citizen.  I am Founder and Managing

Partner of Global Payments Experts llc. (GPE), a U.S.-based payments industry niche

consulting firm serving clients worldwide.  I founded GPE in 2003 as the successor firm

to Wilhelm Associates, which I founded in 1998.  With deep domain expertise bolstered

by decades of direct experience in the payments and financial services industries, GPE

provides risk management, marketing, business strategy, and product development

consulting to deliver superior profitability results.  GPE's unique blend of deep domain

expertise, experience, proven results, and unparalleled access to global best practices has

brought $100s of millions in recurring annual earnings improvements to over 50 of the

world's top financial institutions and payments industry leaders in the U.S., Asia, Latin

America, and Europe.  GPE clients include Bank of America (and MNBA), Bank of

Tokyo-Mitsubishi UFJ, Barclays Bank, Capital One, Chinatrust, Citigroup, First Data

Corp., HSBC, GE Capital, ICICI, JPMorgan Chase, Standard Chartered Bank, U.S. Bank,

Visa Inc., Wachovia, Washington Mutual (and Providian), and Wells Fargo.


2.      I have over 20 years of executive and 14 years of consulting experience specializing in

risk/reward optimization and value creation; payment card products; credit, fraud, and

operational risk life cycle/portfolio management, scoring, collections, and recoveries;

risk-based marketing, segmentation, and pricing for card/loan products; new product and

**PX 4-2**

market innovation; and starting/scaling new companies and lines of business.  As Senior

Vice President of Wells Fargo, I pioneered the successful transfer of credit scoring and

credit card business model principles to Retail deposit portfolios, products, and channels.

I also conceived and launched over 40 new fraud detection and prevention programs,

including predictive decision and AI technology solutions.  As a founder and Board

Director for Primary Payments Systems, Inc., a U.S. bank-owned risk information bureau

and products company, from 1994 to 1998, my intellectual capital and thought leadership

catalyzed the creation of a high value risk products engine that fueled company growth

from 0% to 70% national market share in 5 years. I also serve on the Board of Directors

of iPeopleFINANCE, a social finance platform combining peer-to-peer lending with a

seller-financed marketplace for goods and services, and from 2005 to 2006, served as

Chief Fraud Domain Strategy Officer and Advisor to the Board and CEO for Cydelity, a

venture-backed early stage innovative online risk management company.


3.    Representative consulting engagements include developing and overseeing

implementation of strategies to seize credit card, debit card, deposit product, and risk

value creation opportunities at 9 of the top 15 U.S. financial institutions and 3 of the top

10 payments providers, resulting in annual client earnings improvements ranging from

$30 million to $175 million.  They also include developing and overseeing integrated

end-to-end credit card and loan product risk life cycle management road maps to achieve

profitable consumer and small business lending and growth at more than 20 of the top

financial institutions in Latin America and Asia.

4.      Prior to entering the consulting business, I was a 20 year veteran of Wells Fargo Bank from 1979 until 1998, where I served as Senior Vice President and head of risk management and Vice President of credit cards, debit cards and liability accounts for consumer and small business portfolios, among other senior roles.  Representative responsibilities during my career at Wells Fargo included delivering over $500 million in recurring annual earnings increases, revenue to expense ratio improvements on multiple fronts, and risk-differentiated customer life cycle value, pricing, and competitive advantage for Retail product points of transaction, acquisition, and cross sell.  They also included overseeing profits and losses for overdraft lending and operating losses and reengineering, centralizing, and managing collections, customer disputes, and loss analysis and reporting for deposit and credit card portfolios and operations.

5.      I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to the facts stated herein.

6.      Based on my experience, training, education, and results as summarized above and as demonstrated in my biography attached hereto as **Wilhelm Attachment A**, I consider myself to be an expert in the field of risk management as it relates to financial and payments services companies.  My expertise and direct experience includes the credit card industry and the methodology used to calculate credit card interest rates and other price points that financial institutions assign to their credit card customers, as well as credit card and other loan product acquisition, retention, collections, and recovery strategies and tactics used by financial institutions.

**PX 4-2**

FTC ALLEGATIONS

7.      Federal Trade Commission ("FTC") staff has informed me that the FTC is investigating

certain companies ("FTC Defendants") that make unsolicited telephone calls to

consumers and represent that they are able to dramatically lower interest rates on

consumers' existing credit cards.  Frequently, the FTC Defendants represent that they can

lower the interest rates on consumers' existing credit cards to as low as 0% to 7% or

alternatively, to cut consumers' current interest rates by a specific percentage, e.g., up to

9% or by half.  The FTC Defendants typically claim that they can lower the interest rates

by successfully negotiating with the consumer's credit card issuers to lower the

consumer's interest rate on their existing cards, or by obtaining a new low or zero interest

credit card for the consumer and transferring the balances from their existing cards or

card to the new card.  The FTC Defendants often claim they will obtain the low interest

rate for the consumer even if the consumer is delinquent or over limit on one or more

cards, as long as the consumer has at least one credit card that is current and in good

standing. The FTC Defendants also often tell consumers they can achieve the interest rate

reduction without harming the consumers' credit score and that they will continue to

periodically (e.g., every 3 months) negotiate with the consumers' creditors to obtain the

best interest rate over a period of years ranging from one year to the lifetime of the credit

card debt.  The FTC Defendants routinely tell consumers the interest rate savings they

will obtain for them will result in a substantial minimum interest savings (typically

$2,500 or more), usually without paying any more monthly than they have been paying,

and that consumers will be able to pay off the balances on their existing credit cards two

to five times faster.  The FTC Defendants charge consumers up-front fees for their

**PX 4-2**

service, which often range from $399 to as high as $3,000. The FTC Defendants often represent that the amount of money consumers will save as a result of the lower interest rates the FTC Defendants obtain for consumers will well exceed the amount of the fee consumers are charged. FTC staff has asked me to provide insights regarding the feasibility and credibility of these FTC Defendants' representations and claims made to consumers.

## THE U.S. CREDIT CARD PRICING ENVIRONMENT 2008-2012

8.     In 2008 and 2009, the credit card industry was hard hit by rising unemployment and bankruptcies, falling home prices, credit contraction, and consumer distress. Spiraling credit card delinquencies, record defaults, declining recoveries, and a "jobless" economic recovery decimated industry earnings and capital. Earnings for the top 11 U.S. credit card issuers fell 67% in 2008, and in 2009 industry pre-tax profitability was a negative (1.79%) return on assets for the first time ever. For the top five issuers, this represented $17 billion of lost profits in a single year.

9.     In the midst of the crisis, new regulations – the May 2009 Credit Card Accountability and Responsibility (CARD) Act, the 2008 Unfair and Deceptive Acts and Practices (UDAP) Act, the Federal Reserve's amended Regulation AA, and the Consumer Financial Protection Agency (CFPA) Act – introduced a tidal wave of long overdue consumer protections and restrictions, which took effect in 2009 and 2010. These regulations limited a central element of most credit card pricing schemes, risk-based pricing.

**PX 4-2**

10.     Under risk-based pricing, an issuer establishes a rate of interest and other non-interest

pricing elements such as annual fees, fees for cash advances and balance transfers, or fees

for late payments or over limit transactions, credit limits, and the like based on a

customer's risk profile.  If the customer borrows and pays within the terms of the plan,

that rate applies.  If the borrower fails to meet those terms, e.g., pays late or goes over

limit, the issuer may re-price the credit to reflect the higher credit risk revealed by the

new risky behavior.  To accurately set interest rates for particular card products to deliver

value while earning a profit, credit card issuers also consider loyalty, reward or cash back

program costs and benefits; merchant interchange fees; add-on product fees such as

various types of insurance; the cost of funds for making credit card loans; operating costs;

and credit losses.  The financial institution's credit risk profile and appetite/tolerance for

risk and prevailing market rates/competition also play a critical role in determining the

lowest or highest credit card interest rate offered or made available to an individual

consumer with a particular credit card product.


11.     The new laws and regulations instituted a sea change in how credit cards are priced and

marketed.  The impacts on credit card pricing most germane to FTC Defendant's claims

are summarized here.  On the interest rate front, they ban "any time, any reason" interest

rate hikes on existing card balances, permitting rate hikes primarily only when the

borrower pays late on the issuer's credit card by 60 days or more. Sixty-day

delinquencies usually trigger a hike to the rate known as the "penalty rate," which can be

up to 30% or more. However, issuers are required to restore a consumer's rate hike due to

60-day delinquency back to the pre-penalty interest rate if the consumer makes the

6

**PX 4-2**

minimum payment for the six months immediately following the increase. This rule applies only to existing balances. Issuers may continue the penalty rate or a higher rate on new purchases indefinitely (as well as on existing balances if the consumer does not make the required minimum payments for six months), but are now required to reevaluate the consumer's risk factors that resulted in the higher rate no less than every six months for potential interest rate reductions. The laws and regulations also require promotional rates to remain in effect a minimum of six months and do not permit increases in interest rates and fees during the first year the account is open. After the first year, the issuer must provide 45-day written notice of pricing changes, which cannot be applied to transactions that occurred before the increase. Issuers must also give consumers more time to pay (mailing statements at least 21 days before the payment due date) and the ability to opt out of pricing increases by closing their accounts and paying off their balances. The laws and regulations also ban double-cycle billing, require issuers to apply amounts in excess of the minimum payment first to the card balance bearing the highest rate of interest and then to each successive balance bearing the next highest rate of interest until the payment is exhausted, and require opt-in for over limit transactions. They also require that late fees and other penalty fees must be "reasonable and proportional" to the violation of the account terms in question, and set "safe harbor" benchmarks at $25 for a first violation and $35 for a second violation within the next six months. Late fees also may not exceed the minimum payment due. And finally, the laws and regulations require issuers to consider the consumer's income capacity to make the required payments before issuing a card or increasing a credit limit.

**PX 4-2**

IMPACTS ON CREDIT CARD INTEREST RATES AND MARKETING 2008-2012

12.     With poor economic conditions hammering revenue, high delinquencies and losses, negative earnings, and new regulations that would limit the industry's flexibility in aligning price with risk for existing customers, credit card issuers made a number of changes to improve their credit quality and return to profitability. First and foremost, issuers raised credit card interest rates throughout 2009 and 2010 due to record industry losses and because issuers would no longer have the ability to re-price interest rates higher based on credit risk or to rely on fees to cover the added risk as extensively as before February 2010. They also got a lot smarter when setting initial credit card rates, which in many cases meant starting out with a higher rate. For cardholders carrying balances (which exclude convenience users who pay off their balances every month during the interest free grace period), average rates climbed from 13.57% in 2008 to 14.31% in 2009, peaked at 14.26% in 2010, leveled off to 13.09% in 2011, and declined to 12.9% through June 2012. Penalty rates also crept higher, with the average jumping from 27.9% to 28.6% between 2010 and 2012, and can now top 30%. It is important to note, however, that while average rates paid by consumers moved in a relatively narrow band over the last several years, interest rates charged vary considerably across credit card plans reflecting various plan features and most significantly, the risk profile of each cardholder.

13.     Second, issuers aggressively cut credit lines on or closed millions of credit card accounts to reduce risk in a flight to credit quality. Between the end of 2007 and the first quarter of 2010, issuers cut $1.25 trillion in credit card lines, and, by some estimates, cut another

$1.5 trillion in credit lines by the end of 2010.  In 2009, banks closed credit cards at a rate of 15% annually, double the 2008 rate.  At the same time, consumers have been de-leveraging, using credit less in favor of debit and savings (both because creditors have taken away their lifelines of credit cards and home equity and because of an abundance of consumer caution).  After steadily rising for years, since the end of 2007, revolving credit card balances have fallen 19.3%, from a high of $1 trillion in December 2007 to $815 billion in July 2012.  Issuers also substantially tightened credit standards and income requirements to minimize losses, contributing significantly to the credit contraction and a steep decline in portfolio growth.  For people with bad credit, access to credit card loans dried up.  In 2012, issuers are a little less risk adverse, but only marginally so.

14.    Third, the CARD Act accelerated an existing trend toward credit card issuers offering cards with variable interest rates, which are now nearly universal, and away from fixed interest rate credit cards, which have virtually disappeared except for time-limited promotional rates (see paragraphs 19 and 20).  Variable rates are determined by adding the credit card issuer's margin rate (a percentage tied to the credit worthiness of the customer and business conditions) to an economic index, which is most often the Prime Rate set by the Federal Reserve Bank.  The Prime Rate is the average interest rate charged by 75% of the nation's banks to their best, most credit worthy, and usually large business customers.  Variable rates enable card issuers to raise rates quickly when the cost of funds rises, and, historically, pass along rate reductions to consumers when the cost of funds decline.  Under the CARD Act, credit card companies may still re-price outstanding balances if they were extended under a variable rate plan and the underlying

index used to establish the rate changes.

15.     The average Prime Rate for 2007 was 8.02% and dropped to 4.92% in 2008.  In January 2009, it dropped to 3.25%, where it has remained through September 2012, the lowest on record since the early 1950s.  Historically, variable credit card rates moved up or down in lockstep with the Prime Rate, and changed as often as the Prime Rate or another underlying Federal Reserve economic index changed.  In the recession of 2007-2009, unlike other types of loans, the historical correlation between the ups and downs of the Prime Rate and credit card rates diverged.  Beginning in early 2008, credit card interest rates rose while the Prime Rate dropped.  In 2009 and 2010, the divergence between the low Prime Rate and higher credit card rates widened further.  The key factors in the 2008-2010 credit card rate rises were the adjustments credit card issuers make to the minimum and maximum margin rate from time to time as economic or business conditions changed, which were highly negative during this period, and issuers' anticipation of reduced flexibility to re-price interest rates for risk after February 2010. In 2011 and 2012, rates have remained relatively stable and slightly lower as the industry returned to profitability and competition heated up.

16.     Margin rate ranges also often vary for purchases, cash advances, and balance transfers. Cash advances, which are riskier than purchase transactions, are typically assigned margin rates that are on average 5.0% to 7.0% higher than purchase margin rates.  Low or zero balance transfer and purchase interest rates may be offered at promotional rates for a limited time (now required to be at least six months if offered) to attract new customers.

Finally, most issuers will apply the highest penalty margin rate if a customer is 60 days or more late in making payments.

17. Last, but not least, in addition to all of the above factors, the margin rate added to the Prime Rate for an individual consumer depends on the customer's credit score or rating and the quality and size of other account relationships he or she may have with the bank. Issuers consider a variety of factors in determining a consumer's internal credit score or rating maintained by the creditor in assigning or reassigning consumers to a margin tier or segment.  These factors include, but are not limited to, the consumer's credit bureau and internal behavior score; utility, rent, or telephone payment history; the length of time the consumer has been a customer; and the recentness, severity, or prevalence of payment delinquencies or over limit transactions on the credit card, other loans, or overdrafts. They also include the current level of indebtedness or credit utilization (how close the balances are to the maximum credit line limits); how long the consumer has been using credit; the consumer's pursuit of new credit (how many, how recent); and what types of and the size of credit lines on other credit cards and loans the consumer has outstanding. A customer's income/employment and other loan, deposit, investment account balances/assets, and performance history with the bank indicating evidence of ongoing cash flow to repay loans are additional factors evaluated.  After considering and weighing all of these factors, a consumer will be categorized into a margin rate tied to his or her degree of creditworthiness, e.g., excellent credit, above average credit, average credit, needs improvement credit, poor credit, or limited credit history.  Issuers also move consumers periodically from one margin rate tier to another based on their credit risk

profile, e.g., from prime to subprime or from prime to superprime, as consumers' credit behavior deteriorates or improves over time, such as missed payments, shifts from low to high credit line utilization, or always current payments. These movements are generally less frequent, as it takes a period of months of good or risky credit behavior to affect consumers' credit ratings, even after a major economic event, such as unemployment. Economic and business conditions for the credit card industry also have a major influence on the minimum and maximum margin and assigned interest rates for credit cards. Using all of these factors, issuers also reduce or raise consumers' credit limits to control risk or increase customer retention, spending, and loyalty.

18.     Prevailing regular low interest rate offers (meaning without regard to promotional rates included in the offers) in September 2012 for borrowers with excellent credit (generally, consumers with credit scores of 750 to 850) range from a low of 7.25% to a high of 14.99%. This means the issuer adds a margin to the current Prime Rate of 3.25% of 4.00% to 11.74%. The average regular rate for low interest card offers is 10.40% in September 2012. The prevailing regular variable interest rate offers on balance transfer credit cards for borrowers with excellent credit range from 8.00% to 15.99% in September 2012. This means the issuer adds a margin to the current Prime Rate of 3.25% of 4.75% to 12.74%. The average "go-to" or regular rate for balance transfer cards is 12.62%. Average rates in both cases are virtually unchanged from six months ago and are slightly down from the average rates in 2011; virtually all offers are variable rates. In most cases, issuers only offer these interest rates to borrowers with excellent credit or at the high end of good credit. Typically, borrowers with good credit (generally, consumers

with credit scores of 660 to 749) will be offered rates that are at least 5 percent higher, and borrowers with fair credit (generally, credit scores of 620 to 659), if approved for these products at all, will be offered rates that are at least 9 to 10 percent higher. Borrowers with bad credit (generally, credit scores below 620) will not be approved at all for these products. While subprime credit card offers are making a cautious return to the marketplace, most issuers are offering only secured cards for this segment (meaning customers must secure their credit line with an equal deposit amount) or cards with high interest rates, annual or monthly servicing fees, or other one-time set up or program fees.

19.   Zero percent credit cards offer a time-limited promotional rate for balance transfers and purchases.  In 2009, zero promotional rate time periods fell to an average of 6 months, and in 2010, balance transfer offers declined 60 percent as issuers retrenched.  In 2011, zero percent balance transfer offers averaged 7 months as issuers' profitability improved and increased to 10 months by the first quarter of 2012.  In 2011, banks were looking to restart growth by luring new high quality, high value customers onto their books.  Zero percent promotional rate time periods of up to 24 months began to appear.  In 2012, issuers pulled back somewhat; 18 months are still available, but most range from 12 to 15 months, and competing offers remain high.  To offset the costs for these promotional rates, issuers charge an average balance transfer fee of 3 percent on each balance transfer, but may charge as much as 5 percent. Issuers also help pay for these longer promotional rates by charging higher go-to interest rates at the end of the promotion than cards that do not include zero or low promotional rate offers.

**PX 4-2**

20.   Issuers generally limit zero or low promotional rate cards largely to borrowers with excellent credit (e.g., credit scores above 720).  Even with an excellent credit score, borrowers may still be declined, such as if they have too much revolving debt relative to their credit lines (e.g., over 40% to 50%), too many recent credit inquiries, or a high debt to income ratio (e.g., above 36%).  While issuers do approve a small percentage of applicants with good or even fair credit for these cards, issuers will offer them at significantly higher go-to rates and lower credit limits, and may offer them shorter promotional rate time periods than the advertised offer.  The likely size of the credit limit associated with these cards determines how much high rate balances consumers can transfer to these cards.  As a rule of thumb, an issuer is not likely to grant a credit limit any higher than the average credit line of all cards held by the consumer, and it may be lower.  The issuer also factors in the consumer's income, expenditures, employment situation, and credit risk profile in establishing the credit limit for the card.  If the consumer has a high debt percentage to overall credit and receives only a credit line equal to or lower than the average credit line across all of the consumers' cards, the balance transfer interest reduction benefits the consumer will be able to achieve will be greatly diminished, especially when considered in combination with the balance transfer fee.  In addition, issuers generally do not permit balance transfers from any other card issued by them to a zero rate credit card, since the objective of the offer is to attract new balances and customers, and there is no grace period or rewards on transferred balances.  If the consumer does not pay on time, the issuer may end the promotion rate and apply the penalty rate.

21.    Each application for a new credit card, whether approved or declined, creates an inquiry that will typically lower a consumer's credit score by 5 to 10 points in the short term (about one year).  It is important that consumers, before applying, carefully weigh the risks of not being approved, being granted a too low credit line, and the consequences of not being able to pay off the balances during the promotional rate time period, along with the benefits. For consumers with excellent credit and the capacity to pay off all or most of their debt within the promotional period, these cards can have very beneficial impacts on both their finances and their credit. For consumers with less than stellar credit and high debt loads, more than one declined application, or approvals with very low credit limits, applications are likely to create further negative impacts on their credit and lead to actions by issuers on their existing cards, such as credit line reductions, that can make their original debt situations more difficult to resolve. For these consumers, it is much better to wait before applying until they pay off more of their balances and improve their credit to increase their approval chances later. Most new issuers will not to take on the risk of payment default or delinquencies from another issuer or new customers that do not have the capacity to use credit for new spending within a reasonable time, especially in the current cautious credit and economic environment.

FEASIBILITY/CREDIBILITY OF FTC DEFENDANTS' REPRESENTATIONS/CLAIMS

22.    Without knowing in advance what credit card products a specific consumer currently holds, and without knowing the consumer's individual economic, financial, credit, and personal circumstances, it would be impossible to make any kind of blanket claim regarding what, if anything, credit card issuers would do in regards to lowering the

**PX 4-2**

interest rates on those cards or issuing low rate balance transfer cards. Credit card issuers consider interest rate reductions or approve new zero or low rate balance transfer cards for an individual consumer only after the particular creditor engages in an individualized, case-by-case assessment, as described in paragraphs 17, 23, and 24. In my experience, up front blanket representations and claims by a third party that guarantee a specific interest rate reduction, such as to as low as 0% to 7% or cutting a current rate in half, a minimum interest savings amount (e.g. $2,500 or more), or a two to five times faster debt payoff, would be impossible to deliver without a case-by-case assessment by the creditor. Further, the likelihood of success in engaging credit card issuers to lower interest rates for customers making on-time payments in the recent credit card interest rate environment, even after a case-by-case assessment by the creditor, would be extremely low. In addition, up front third party representations, claims, and promises to identify and offer low rate or zero interest rate balance transfer cards in lieu of interest rate reductions to achieve the promised savings would be impossible to deliver without prior approval from the creditor making the offer.

23.     Financial institutions combine a range of sophisticated customer risk, profit, and retention models and analytics with collections activity/action progress evaluation and insights about the customer's current situation to assess what, if any, interest rate reduction plans to offer to a consumer. Permanent interest reductions for consumers in good standing, if offered at all, would usually be modest, in the range of 1 to 3 percent. In the recent past, and for the foreseeable future, rate reductions for non-delinquent consumers with an income and on-time payments would be more unlikely than likely. Even for the best,

**PX 4-2**

most credit-worthy customers, prevailing average interest rates over the last year are 10.4%, with the lowest on offer at 7.25%; go-to rates for balance transfer cards average 12.62%, with the lowest on offer at 8.0%. Interest rate reductions to the 0% to 7% range are therefore totally unrealistic and extremely unlikely except for time-limited promotional rates on new balance transfer cards. Issuers are far more likely to let a customer leave the bank, rather than retain the customer with a too low interest rate that would be unprofitable.  No more is this true than in the last several years, as the industry faced the biggest crisis in its history, and only just returned to acceptable profitability in the last 18 months.  The evidence is crystal clear on this point, as the industry's losses and the economic crisis forced issuers to dramatically curtail growth, credit availability, and customers, and to increase interest rates to regain and sustain profitability.

24.     If a typical consumer called his or her credit card customer service number and asked for an interest rate reduction, a typical issuer would evaluate that request based upon several factors including the cardholder's individual situation, credit standing, and overall bank relationship; competitive market forces; prevailing market interest rates; customer retention strategies; and the specific card product benefits and profitability.  If, based on these factors, the consumer has excellent to good credit and the issuer decided to lower the interest rate, the amount of that reduction would likely only be 1-3 percentage points lower than the consumer's existing rate. If the consumer has triggered a 60-day delinquency rate hike, the issuer will not lower the rate on existing balances unless he or she has met the 6-month current payment requirement. If the consumer has triggered the 60-day delinquency rate hike on new purchases, or is already in or has moved to a higher

risk margin tier associated with a higher interest rate to cover the risk, an issuer will almost never lower the interest rate until the consumer's own payment and credit behavior improves enough to merit the move to a lower risk margin tier. This includes consumers that are delinquent on one or more cards or loans, even if they are current on the issuer's own card. While issuers may no longer raise rates on these consumers unless they become 60 days or more delinquent on the issuer's own card, they most certainly will not lower the consumer's rate or issue new credit to them. As stated previously, movements between risk margin tiers take a period of months of consistently improved or deteriorated consumer credit behavior before the shift from one margin tier to another takes place. Finally, if the issuer has raised a consumer's rates due to the consumer's 60-day delinquency, market conditions, or other factors, the issuer must reassess those factors at least once every six months to determine if the conditions have changed sufficiently to merit lowering the rate, and if so, lower the rate if indicated. Under this automatic process, issuers typically do not lower the rate unless the consumer has moved to a lower risk margin tier.

25.     In addition, issuers would typically only apply the rate reductions to new purchases or cash advances, or to specific portions of outstanding purchase, cash advance, or transferred balances, not the entire balance.  In my experience, both before and during the current economic crisis, it is extremely unlikely that an issuer would lower a typical consumer's interest rate down on total new or outstanding balances for customers that are current on their payments to their creditors.  This is particularly true if a consumer already has a relatively low interest rate (e.g., 9% to 15%).  Since interest revenue

**PX 4-2**

represents the lion's share of credit card revenue needed to cover expenses and make a profit, any claims to reduce interest rates to as low as 0% to 7% are totally unrealistic, as stated previously. By the same token, few if any consumers who carry high credit card balances versus their available credit or are delinquent on any credit accounts would be able to credit-qualify for an additional credit card, including ones offering low or zero promotional rates for balance transfers.

26.    If a consumer is already in a late stage delinquency (90 days or more of overdue payments) or already written off as a loss (all accounts overdue 180 days+) due to a severe economic crisis such as a job loss, on a case-by-case basis, card issuers may agree to steeply reduce a consumer's credit card interest rate on overdue balances. Issuers may consider this step to recover a portion of the debt when they believe they are otherwise likely to recover nothing. Issuers invariably couple such rate reductions with a regular repayment schedule (usually between 2 and 4 years) negotiated between the consumer and the financial institution, and require consumers to close all of their credit card accounts and not open any new credit accounts during the repayment term. Often, the issuer will also refer the consumer to a reputable, non-profit Consumer Credit Counseling Service (CCCS) Agency to help put their finances back on track. Issuer rate reductions coupled with overdue or charged off debt repayment plans and credit card account closures under these circumstances differ greatly from those claimed by FTC Defendants.

27.    To test the credibility of FTC Defendants' routine claims of a guaranteed minimum interest savings amount of $2,500, and paying off debt two to five times faster, I offer

three 'real-life' examples based on those claims. In the first example, the consumer has $5,000 in credit card debt with a current interest rate of 17% and is paying $150 per month (19% above the minimum payment required) and it will cost him $1,815 in interest and take him 48 months to pay off his debt. FTC Defendants claim they can cut his interest rate in half (to 8.5%) and charge a $595 fee to the consumer's credit card, bringing his balance to $5,595. If the consumer continues to pay $150 a month and makes no new purchases while paying off what is now a $5,595 debt, he will pay a total of $1,521 ($926 in interest plus $595 in fees) and it will take him 44 months to pay off his debt. The consumer achieves interest savings of $296 net of the $595 fee and pays back his debt only 1.1 times faster.

28.  In the second example, using the same consumer, FTC Defendants claim they can obtain a new card with a zero interest promotional rate and transfer the consumers' balances to the new card, and charge him a $595 fee to his credit card, bringing his balance to $5,595. I assume they obtain a 15-month zero interest promotional rate card with a go-to rate thereafter of 4% (however unlikely in the current environment) and a balance transfer fee of 3%. If the consumer continues to pay $150 a month and makes no new purchases while paying down what is now a $5,595 debt, he will achieve interest savings of $174 net of fees over the duration of the promotion period. This savings is comprised of $937 in interest savings he would have achieved had the debt remained at $5,000 minus $763 in fees - $595 charged by the FTC Defendants and $168 in balance transfer fees charged by the new issuer. At the end of the promotion period, he will have $3,345 in balance remaining to pay off at the 4% rate at $150 per month. He will pay a total of

$137 in interest (saving $320 in interest assuming his starting debt had remained at $5,000) and it will take him 24 more months to pay off his debt, bringing his total payback period to 39 months. The consumer achieves total interest savings of $494 net of the $763 in fees and pays back his debt only 1.2 times faster.

29.    In the last example, the consumer has $10,000 in credit card debt with a current interest rate of 21% and is paying $325 per month (15% above the minimum payment required), and it will cost him $4,485 in interest and take him 45 months to pay off his debt. FTC Defendants claim they can cut his interest rate to 9% and charge a $995 fee to the consumer's credit card, bringing his balance to $10,995. If the consumer continues to pay $325 a month and makes no new purchases while paying off his debt, he will pay a total of $2,730 ($1,735 in interest plus $995 in fees) and it will take him 40 months to pay off his debt. The consumer achieves net savings of interest minus fees of $1,755 and pays back his debt only 1.1 times faster.

30.    In all three examples, the interest savings and payback period acceleration based on a small sample of FTC Defendants' real-life claims are not credible and are not achievable even if they could secure the low level of interest rates they are claiming. In the prevailing interest rate and credit environment, in the vast majority of cases, the FTC Defendants would not, in fact, actually be able to achieve the low interest rates they are claiming, even for consumers with stellar credit. For consumers with very high interest rates, very high debt, and the ability to pay back more each month, it is of course theoretically possible to achieve the FTC Defendants' claimed minimum $2,500 interest

savings and a faster payback period. However, consumers that fit this profile are the least likely to qualify for any rate reduction at all because they are already in high risk margin tiers or paying the penalty rate, and most are not in a financial position to increase their monthly payments (in fact, many are paying only the minimum payment).

31.     Furthermore, it is not even possible to calculate on an individual basis the amount of interest that a particular person will pay on his or her credit card debt without first taking into account at least three critical pieces of information. These are: 1) the balances on the credit cards, 2) the interest rate on each credit card, and 3) the monthly payment amount on each card. Likewise, any potential savings achievable through a reduction in an interest rate cannot be calculated without this information and the new, reduced, interest rate. Without this information, it is not possible to promise a specific amount of savings or a reduction in the amount of time necessary for a particular person to pay off his or her debts. It is also not possible to promise no adverse impact on a consumer's credit from applying for new zero or low rate balance transfer credit cards without knowing a consumer's individual credit situation because each application has a small negative impact on credit scores (5 to 10 points) as stated previously. Multiple applications can lead to much larger additive negative credit effects such as slashed credit limits on or account closures of consumers' existing cards, and can harm consumers' ability to successfully obtain future credit for at least a year and up to two years.

32.     In my experience, the involvement of a third party would not impact an issuer's decision to reduce an interest rate.  Not only do third parties such as the FTC Defendants not have leverage, clout, or formal relationships with issuers, in fact, the involvement of a third

**PX 4-2**

party in negotiating a rate reduction is counterproductive for the consumer. Financial institutions prefer to work directly with their customers on a one-on-one basis, and do not respond to "pressure" from third parties such as the FTC Defendants. In my experience, I know of no financial institution that has a relationship with such organizations for performing consumers, and virtually all would view such involvement in a negative light. Most would refuse to knowingly work with the third party, and instead agree only to work directly with the consumer. Further, in my experience, all financial institutions would refuse to talk to a third party without the consumer being present on the call, and would terminate the call with the third party if the consumer got off the call.

33.    When asked directly by the consumer, most issuers will evaluate rate reductions and the decision to make a rate reduction or not would depend entirely on individual circumstances as stated previously. A financial institution will assess the likelihood of repayment, and how much will likely be repaid without a rate reduction on the full range of a consumer's economic, financial, credit, and personal circumstances. If the financial institution deems that a customer can handle the payments without lowering the interest rate, is high risk and making on-time payments, or that an interest rate reduction would simply make the customer unprofitable, an interest rate reduction is an unlikely outcome of the negotiation. Further, issuers who decide to reduce the consumer's interest rate will usually offer a rate reduction of 1% to 3% and charge no fee for this service. Third parties such as the FTC Defendants have no leverage at all with issuing banks in my experience. And finally, consumers who have excellent credit can easily apply for low or zero interest balance transfer cards without incurring the FTC Defendants' fees to achieve

**PX 4-2**

significantly higher net interest savings.  The current environment is highly competitive.

34.    I am willing to travel within the United States or internationally to testify in any court

action concerning the above stated facts.

I declare, under penalty of perjury, that the foregoing statement is true and correct.

Executed on October 4, 2012

Lisa T. Wilhelm
Managing Partner
Global Payments Experts llc.

24

**PX 4-2**



**Wilhelm Attachment A**
**Lisa T. Wilhelm**
**Founder and Managing Partner**



Lisa Wilhelm is Founder and Managing Partner of Global Payments Experts llc. (GPE), a U.S.-based payments industry niche consulting firm specializing in small business and consumer risk management, payments products, marketing, and operations serving clients worldwide since 1998. GPE's unique blend of deep domain expertise, experience, proven results, and unparalleled access to global payments best practices has brought $100s of millions in recurring annual earnings improvements to over 50 of the world's top financial institutions and payments industry leaders in diverse country markets across the U.S., Latin America, Asia, and Europe.

Ms. Wilhelm has 20 years of executive and 14 years of consulting experience specializing in risk/reward optimization and value creation; credit, debit, and prepaid payments products; credit, fraud, and operational risk life cycle management; credit/behavior scoring; risk-based marketing, segmentation, and pricing; new product and market innovation; and starting and scaling new companies and lines of business. As SVP of Wells Fargo, Ms. Wilhelm pioneered the industry's first successful transfer of credit scoring and credit card business model principles to Retail consumer and small business deposit portfolios, products, and channels. She also conceived and launched over 40 new fraud detection and prevention programs, including predictive decision and AI technology solutions. As a founder and Board Director for Primary Payments Systems, Inc. (a U.S. shared bank risk information bureau), her intellectual capital and thought leadership catalyzed the creation of a high value products engine that fueled company growth from 0 to 70 percent national market share in 5 years.

At Wells Fargo, the 4th largest U.S. bank by assets and 1st in small business lending, Ms. Wilhelm originated and managed the Risk Management Division responsible for payment risk management strategies, the overdraft lending P&L, and operations in all physical and remote channels for 11 million Retail accounts. She delivered over $500 million in recurring annual direct expense savings, and revenue to expense ratio improvements on multiple fronts, bolstered by a successful track record innovating, delivering, and scaling products, services, and operations. Ms. Wilhelm's continuous improvement of and competitive advantage in differentiation between good and bad customers and likely prospects from unlikely ones enabled Wells Fargo to bring risk-differentiated value to customers at all points of transaction, account/card acquisition, and product cross-sell.

Ms. Wilhelm reengineered, centralized, and managed collections; recoveries; fraud investigations and customer dispute management; loss analysis, accounting, and reporting; and loss prevention operations and strategies for Wells Fargo's consumer and small business Retail loan and deposit portfolios and item processing support operations. She also led the design and integration of innovative, multi-media risk reduction communications and incentive-based training programs for sales and service employees in all distribution channels. Finally, she reinvented her Division's processes and operations through the massively complex First Interstate merger.

Before originating the Risk Management Division in 1990, Ms. Wilhelm managed authorizations, fraud risk management, customer disputes, and accounting for Wells Fargo's credit card portfolio, including directing a large-scale project to bring authorizations and payment processing in house from an outside processor. For seven years, she also managed Wells Fargo's debit card portfolio (the 2nd largest U.S. debit card issuer) and ATM/POS networks, including launching and managing the PLUS, Interlink, and STAR shared payments networks, customer service, and other debit card operations.

Well-known in the financial services industry for establishing Wells Fargo's reputation as the leader in the payment risk field, Ms. Wilhelm serves on the Board of Directors of iPeopleFINANCE, served on the Advisory Board to Cydelity, has appeared on NBC DateLine and CNN, and has been widely quoted in news media and industry trade journals. A lifetime advocate of human rights and free market economies, Ms. Wilhelm travels and consults extensively in Eastern Europe, Central Asia, the Caucasus, and Russia, and is a volunteer with the FSVC. She also served as International Co-Chair for Aid to Soviet Dissident Women and Children from 1986 to 1991 and was the editor, research associate, and photographer for *Hitler's Death Camps: the Sanity of Madness*, a Holocaust book published in 1981. Ms. Wilhelm is an alumnus of the CBA Graduate School of Retail Bank Management at the University of Virginia, the University of Maine, La Sorbonne in France, and the Goethe Institute in Germany. She lives in Marin County, California.

**PX 4-2**



**Global
Payments
Experts llc.**
Experience > Expertise > Results

**Lisa T. Wilhelm**

---

### *Global Payments Experts llc. (GPE)*

With deep domain expertise bolstered by decades of direct experience in the payments and financial services industries, GPE provides risk management, marketing, business strategy, and product development consulting to deliver superior profitability results. GPE experts have brought risk/reward optimization and material new value creation to over 50 of the world's top financial institution and payment industry leaders in the U.S., Asia, Latin America, and Europe.

### *Our Results-Driven Expertise*

**Marketing and Sales**
- New market, channel, and strategy development
- Customized acquisition models and campaign design
- Creative sales strategies and tactics
- Profitable reward, loyalty, and retention programs

**Product Development**
- Comprehensive competition and customer market analyses
- Breakthrough Retail and Commercial product innovation and launches
- Information-based value proposition testing and implementation
- Actionable product lifecycle economic measurement and management

**Risk, Portfolio, Technology & Operations Management**
- Revenue/expense portfolio optimization
- Enterprise-wide credit, fraud, and operational risk management
- Pioneering, predictive credit risk model design and credit life-cycle strategies
- Effective risk-based marketing, segmentation, and pricing strategies
- Enterprise-wide payments networks, technology, operations, and security management

**Strategic Alliances**
- Diverse partnership sourcing, development, and contract negotiations
- Innovative co-branding and sales distribution strategies

### *Our Experience*

Global Payments Experts llc. and its predecessor firm, Wilhelm Associates professionals have worked with many of the world's top financial and payment industry leaders. Our clients include:

| | |
|---|---|
| ABN AMRO Bank | Citigroup |
| American Express | Capital One |
| Banamex | CSAA |
| Banco Azteca | Davivienda |
| Banco Caja Social y Colmena | First Caribbean International Bank |

---

Global Payments Experts llc.
10 Hickory Avenue
Corte Madera, California 94925

August 2012

Office  +1 (415) 927-7746
Mobile +1 (415) 806-3948
email: lisa@globalpayexperts.com

**PX 4-2**



**Global
Payments
Experts llc.**
Experience > Expertise > Results

### Lisa T. Wilhelm

| | |
|---|---|
| Banco de Bogotá | First Data Corporation |
| Banco de Chile | HSBC |
| Banco de Crédito e Inversiones | GE Capital |
| Bancolombia | ICICI Bank Limited |
| Banco Industrial | JPMorgan Chase |
| Bancoomeva | Kookmin Bank |
| Banco Popular | Mitsui Card |
| Banesco | Mizuho Bank, Ltd. |
| Bank of America | Standard Chartered Bank |
| Bank of Tokyo-Mitsubishi UFJ | Sumitomo |
| Banorte | The Doctors Company |
| Barclays Bank | Visa, Inc. |
| BB&T | Wachovia |
| Bradesco | Washington Mutual |
| Caixa | Wells Fargo Bank |
| Chinatrust Commercial Bank | U.S. Bank |

### *Our Team*

- **Deep domain expertise bolstered by direct experience.** Our experts are seasoned executives averaging over 20 years managing all aspects of Retail banking, risk management, and payments at some of the world's leading financial institutions and payments companies.

- **Specialized value creation and implementation competencies.** Our experts are recognized leaders in:

  - New market, channel, product, and company development
  - Consumer and small business debit/credit payment products and portfolio life cycle management
  - Credit scoring model design, business strategies, and economic measurements
  - Small business and consumer credit and fraud risk management/scoring
  - Enterprise-wide operations, fraud, and online risk management and analytics
  - Payments networks and processing
  - Customer acquisition and retention
  - Risk-based marketing, segmentation, and pricing strategies
  - Business model and strategy creation

- **Unparalleled access to leading-edge global payment risk industry best practices.** Our experts incorporate current global risk best practices, strategies, insights, and success tactics to address client opportunities or solve their most pressing issues.

- **A facilitative, minimally disruptive consulting engagement approach.** Our bank and payments veteran experts know how to collaborate in the most demanding of organizations with competing priorities.

Global Payments Experts llc.
10 Hickory Avenue
Corte Madera, California 94925

August 2012

Office  +1 (415) 927-7746
Mobile  +1 (415) 806-3948
email: lisa@globalpayexperts.com

**PX 4-2**



**Global
Payments
Experts llc.**
Experience > Expertise > Results

**Lisa T. Wilhelm**

## Chronology of Business Experience

| | |
|---|---|
| 2003 to Present | **Global Payments Experts llc. (GPE)**<br>Founder and Managing Partner |
| 2012 to Present | **iPeopleFINANCE**<br>Board of Directors |
| 2007 to Present | **WOWRewards**<br>CEO and Founder |
| 2005 to 2006 | **Cydelity**<br>Advisory Board |
| 1998 to 2003 | **Wilhelm Associates** (predecessor firm to GPE)<br>Principal and Owner |
| 1994 to 1998 | **Primary Payments Systems, Inc. (now Early Warning, LLC)**<br>Board of Directors (Founding Board Director) |
| 1979 to 1998 | **Wells Fargo Bank, San Francisco, CA** |
| 1994 to 1998 | Senior Vice President and Division Manager, Risk Management |
| 1990 to 1994 | Vice President and Division Manager, Risk Management |
| 1989 to 1990 | Vice President and District Manager, Product Control,<br>Credit Card Division |
| 1983 to 1989 | Vice President and Manager, Express Banking Division |
| 1980 to 1983 | Assistant Vice President and Manager, Personnel Operations |
| 1979 to 1980 | Communications Officer, Personnel Communications |
| 1979 to 1987 | **Marin Citizens for Energy Planning**<br>Board of Directors (VP of Board and Chair, Strategic<br>Planning and For-Profit Venture Committees) |
| 1978 to 1979 | **Robert Haber Incorporated, San Francisco, CA**<br><br>Pension Plan Consultant |
| 1975 to 1977 | **University of Maine, Portland, ME**<br>Budget Administrator, College of Arts and Sciences |
| 1970 to 1973 | **ESSO Hotel, Mons, Belgium**<br>Hotel Reception Manager (full and part-time during this period) |

## Education

| | |
|---|---|
| 1989 | Graduate, School of Retail Bank Management<br>Consumer Banking Association, University of Virginia |
| 1977 | University of Maine, Portland, ME<br>MA, Degree Candidate (Thesis)<br>Educational Administration/Counseling |
| 1976 | University of Maine, Portland, ME<br>BA, Liberal Studies |
| 1973 | Goethe Institute, Germany<br>Certificate of German Language |
| 1972 | La Sorbonne, Paris, France<br>Diplôme de Langue et Civilisation Françaises |

Global Payments Experts llc.
10 Hickory Avenue
Corte Madera, California 94925

August 2012

Office  +1 (415) 927-7746
Mobile  +1 (415) 806-3948
email: lisa@globalpayexperts.com

**PX 4-2**